TELEMED CORPORATION,
Plaintiff-Appellant,

v.

TEL–MED, INC., and Chicago Medical
Society, Defendants-Appellees.

No. 78–1334.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 24, 1978.

Decided Nov. 29, 1978.

Rehearing and Rehearing In Banc
Denied Jan. 23, 1979.

Malcolm McCaleb, Jr., Chicago, Ill., for plaintiff-appellant.

Melville Owen, San Francisco, Cal., for defendants-appellees.

Before SPRECHER, TONE and BAUER, Circuit Judges.

SPRECHER, Circuit Judge.

This appeal determines that the word "Telemed" as used in connection with the computer-analysis of electrocardiograms by telephone is a descriptive tradename which in the absence of a showing of secondary meaning is not entitled to protection against the use of "Tel-Med" in a noncompeting medical service.

This is an action for tradename infringement, registered service mark infringement, and dilution of service mark and tradename brought by the plaintiff, Telemed Corporation (plaintiff or "Telemed"), pursuant to the Lanham Act, 15 U.S.C. §§ 1051–1127 (1975) and the Illinois Trademark Act, Ill. Rev.Stats., ch. 140, § 22 (1975), which provides for injunctive relief to protect against dilution of the distinctive quality of the name and mark. Jurisdiction is founded upon 15 U.S.C. § 1121 (1976) and 28 U.S.C. § 1338(a) and (b) (1976).

The district court denied injunctive relief to the plaintiff and dismissed its complaint after a bench trial. This appeal followed.

I

In 1969, Telemed initiated a business of providing commercial computer analysis of

electrocardiograms (ECGs) accomplished through the use of special transmitting equipment of a highly sophisticated nature which transmits ECG signals from a patient undergoing diagnosis to plaintiff's central computer via the standard telephone system. After the computer, located in Hoffman Estates, Illinois, signals verification of the telephone connection to the transmitter operator at the sending location, it then signals additional verification of the receipt of patient identification and characteristic data. Next, it receives and analyzes the patient's ECG and teletypes the report back to the sender for use by a diagnosing physician. Currently, plaintiff provides in excess of 125,000 analyses each month to some 1,600 licensees throughout the United States, Canada, and Japan. Since its inception Telemed's annual revenues have increased from $2,629 in 1969 to $11,430,619 in 1977.

Telemed's customers comprise a class of highly discriminating purchasers, including doctors, hospitals, clinics, and medical teaching facilities. To attract additional customers, Telemed regularly solicits business through nationwide mass mailings to the medical community, advertisements in medical and computer periodicals, and by maintaining display booths at local, regional, and national medical trade shows and conventions.

On November 1, 1973, Telemed applied for registration of TELEMED as printed in a distinctive computer-readable "optical font." On August 12, 1975, the United States Patent and Trademark Office issued to Telemed Service Mark Registration No. 1,018,226 based on a first use of October 31, 1969, for the TELEMED service mark as appearing in the distinctive, computer recognition style or "optical font" as shown below:

TELEMED

The registration states that the mark applies to the service of "providing of computerized electrocardiogram analyses to hospitals and private physicians."

Between April and August of 1971, the San Bernardino County, California, Medical Society received public funding grants for a feasibility study into the concept of disseminating health information over the telephone to the general public, particularly those in the lower income segments for whom medical information and assistance was neither readily available nor economically feasible. The feasibility study proved fruitful and in April, 1971, a telephone health care program began. Initially the Society use the name "Telemed" to describe its service program. However, in late fall, 1971, it learned of the existence of plaintiff and its prior use of the same name and changed the program name to Tel-Med. At no time, however, did the San Bernardino Medical Society adopt the "optical font," stylized logo used by Telemed.

On June 26, 1972, the San Bernardino Medical Society applied for a United States Trademark registration for the mark "TEL–MED" to identify its health care information service, namely, recorded messages on specific health subjects made available to the public by telephone. Service Mark Registration No. 959,558 was issued on May 22, 1973. Subsequently, the San Bernardino Medical Society transferred the TEL–MED mark to defendant, Tel-Med, Inc. (defendant or "Tel-Med").

Tel-Med has continued the public service program through a process of recording the health care messages on separate cassette-type tapes, each lasting from three to seven minutes. Tel-Med maintains a master library of these tapes from which spinoff cassettes are produced and distributed to various subscribers. In addition to the tapes, subscribers receive publicity leaflets describing both the program and the topics available. While the text of each message is geared to an eighth-grade comprehension level, all are written by recognized medical experts with the final approval of a message being retained by panels of doctors in each local area. The procedure for hearing a message is simple: a person dials the local "Tel-Med" operator and asks for the mes-

sage either by name or tape number. The operator then inserts the tape into the playback unit and the message is reproduced. Currently, Tel-Med is available in approximately 110 cities. Each month, over 500,-000 messages are played to anonymous callers. Over 20 million calls have been received by Tel-Med operators from its inception to the date of trial. The medical community, the general public, and, indeed, the plaintiff itself highly regard Tel-Med's services as being accurate, understandable, and a valuable health maintenance tool.

Telemed is a Maryland corporation with its principal place of business in Hoffman Estates, Illinois. Tel-Med is a non-profit California corporation with its principal place of business in Colton, California. The second defendant, Chicago Medical Society (Society) is a non-profit Illinois corporation with its principal offices in Chicago, Illinois.

Society is a volunteer organization of physicians who pay membership dues which, in the main, comprise its operating budget. Society first learned of the Tel-Med program in 1974. An ad hoc committee of doctor members was formed to study the program, and, after various negotiations, Society became a licensed Tel-Med subscriber. The Chicago Tel-Med program began in February, 1976. At that time, Society knew of Telemed's service, but did not believe there would be a conflict. Society publicizes its Tel-Med program by circulation of brochures to the general public, as well as by coverage in the local media. Most of the promotional costs were underwritten by third parties, such as Blue Cross-Blue Shield. Society's Tel-Med program currently receives between 2,000 and 4,000 calls per week.

In January, 1977, Society learned that Telemed had received a number of phone calls asking for Tel-Med information tapes. Upon investigation, Society discovered that the Tel-Med program was listed in the telephone directory only under Chicago Medical Society in the "C" section and not under the "T's". Society arranged for the program to be listed under the "T's" in the next issue of the telephone directory. Since the issuance of that directory in July, 1977, Telemed has received less than one call per month intended for Society's Tel-Med program.

## II

Section 32(1)(a) of the Lanham Act, 15 U.S.C. § 1114(1)(a) (1976) provides, in pertinent part, that:

"Any person who shall, without the consent of the [trademark] registrant— (a) use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant . . . ."

The term "colorable imitation" includes any mark which so resembles a registered mark as to be likely to cause confusion or mistake or to deceive. 15 U.S.C. § 1127.

For Telemed to prevail in its action for service mark or tradename infringement, it must establish that the infringer uses a mark likely to cause confusion or to deceive in interstate commerce. The same standards apply equally in an action for registered trademark or service mark infringement. 15 U.S.C. § 1053. The term "service mark" means a mark used in the sale or advertising of services to identify the services of one person and distinguish them from the services of others. 15 U.S.C. § 1127.

Employing the basic principles set forth in *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75, 79 (7th Cir. 1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978), we first must determine where, on the trademark spectrum which ranges through (1) generic or common descriptive and (2) merely descriptive to (3) suggestive and (4) arbitrary or fanciful, the mark "Telemed" falls.

A generic or common descriptive term is one which is commonly used as the name or description of a kind of goods. It

cannot become a trademark under any circumstances. A merely descriptive term specifically describes a characteristic or ingredient of an article. It can become a valid trademark by acquiring a secondary meaning, i. e., by becoming "distinctive, as applied to the applicant's goods" (15 U.S.C. § 1052(f)). A suggestive term suggests rather than describes an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods. Such a term can be protected without proof of a secondary meaning. An arbitrary or fanciful term enjoys the same full protection as a suggestive term but is far enough removed from the merely descriptive not to be vulnerable to possible attack as being merely descriptive rather than suggestive.

Webster's Third New International Dictionary (1966) contains the following:

tele— see tel-

tel *abbr.* \* \* \* 3. telephone . . .

med. *abbr.* \* \* \* 3. medical; medicine . . .

The Court of Customs and Patent Appeals has given its attention to both elements of the subject mark. In denying registration of "Telecolor" for color television transmitting, the court said in *Columbia Broadcasting System, Inc. v. Technicolor Motion Picture Corp.*, 166 F.2d 941, 944, 35 C.C.P.A. 1019 (1948):

"Tele" is a dictionary term which is defined in substantially the same manner by all the lexicographers. We quote that given by Webster's New International Dictionary, Second Edition, 1932:

"Tele— \* \* \* tel—. Combining form from Greek \* \* \* *far, far off*; as in *tele* graph, *tele* pathy, *tele* phone, etc;—often used in naming or designating devices or instruments, usually electrical, which control or direct the action of distant apparatus (as in telecontrol, a device for regulating different electrical circuits at a distance by means of radio-telegraphy, or which have a distant recording apparatus (as in teleanemograph, telebarograph, telebarometer, etc.)."

Even if the word be descriptive to only those skilled in the television art, registration would be deniable . . .

In determining that "Meds" could be used concurrently with "Med-I-Pax," the court said in *Personal Products Corp. v. Allen Laboratories, Inc.,* 141 F.2d 702, 704–05, 31 C.C.P.A. 889 (1944):

The prefix "Med" in appellee's trademark is, as stated by appellee's witness Griswold, defined by the lexicographers as an abbreviation of the terms "medical" and "medicine." See Funk & Wagnalls New Standard Dictionary, Webster's New International Dictionary, and The Century Dictionary and Cyclopedia. Furthermore, it was conceded by that witness, who, at the time of the taking of his testimony, had been engaged in the manufacture of drugs and pharmaceutical products for more than ten years, that he understood the prefix "Med" to be an abbreviation of "medical" or "medicine." Accordingly, the prefix "Med," as used in appellee's mark, is descriptive of the character or quality of appellee's goods, and, therefore, is not the dominant feature of the mark.

\*     \*     \*     \*     \*     \*

Considering the fact that appellee's "Medicated Vaginal Suppositories" are used for medical treatment and for the prevention, cure, or alleviation of disease, whereas appellant's *unmedicated* tampons are devices used solely for catamenial protection, and considering the differences in the marks of the parties, we are of opinion that the concurrent use of the marks on the goods of the parties would not be likely to cause confusion or mistake in the mind of the public or to deceive purchasers.

Both "Telemed" and "Tel-Med" mean "medicine by telephone" or more broadly "medicine at a distance," which is descriptive of plaintiff's services and also of defendant's services. "[C]ombining two descriptive words to form one new word does not automatically render the new term fanciful." *Flavor Corp. v. Kemin Industries,*

*Inc.*, 493 F.2d 275, 283 (8th Cir. 1974). *See* R. Callmann, The Law of Unfair Competition, Trade-Marks and Monopolies § 71.1(d) at 147 (3d ed. 1969) and cases collected therein.

"That the terms used to comprise a trademark . . . represent the combination of several words or parts of words, or are otherwise so formed or malformed that the mark does not appear in any standard dictionary, will not preclude a finding of invalidity based on descriptiveness if the terms which are used, interpreted according to the basic rules of the English language, do sufficiently describe." *Flexitized, Inc. v. National Flexitized Corp.*, 335 F.2d 774, 780 (2d Cir. 1964). In that case, the Second Circuit said at 780:

> Moreover, construing "Flexitized" as having been formed by the root part of the adjective "flexible" and the suffix "ize," it must be interpreted as meaning "capable of being flexed, bent, or made pliable," and is thus further descriptive of plaintiffs' collar stay in light of its susceptibility to being shaped or molded by hand into a desirable style. Thus, we conclude that plaintiffs' trademark, though registered, was invalid . . . .

To find "Telemed" descriptive of plaintiff's services requires no more imagination than Judge (now Justice) Stevens found necessary to conclude that "Homemakers" as applied to household services is merely a descriptive term. *Homemakers Home and Health Care Services, Inc. v. Chicago Home for the Friendless*, 484 F.2d 625 (7th Cir. 1973). He said at 628:

> Since there is the greatest likelihood that such [descriptive] terms will form a part of the trade name used by competitors, there is a corresponding probability that the [descriptive] word will not unambiguously advise the public of the source of the goods or services.

In *American Heritage Life Insurance Co. v. Heritage Life Insurance Co.*, 494 F.2d 3 (5th Cir. 1974), the court affirmed the district court holding that the word "Heritage" is generic or descriptive of life insurance, rather than arbitrary or suggestive. The court said at 11:

> The industry itself evidently recognizes the truth of the district court's finding because the word "heritage" is used in the corporate names of insurance companies all over the country. Although we have looked at the word's etymology, we need not engage in hypertechnical philological analysis to agree with the district court that "heritage" is a singularly appropriate word for conveying information with respect to the nature of life insurance. Mindful of the burden of proof under the "thorough conviction" standard, we cannot say that the district court's finding was clearly erroneous.

In this case the record showed that the Manhattan Telephone Directory for 1977–78 listed some 254 business names beginning with the prefix "Tele" or "Tel" and the Chicago, Illinois, Telephone Directory for July, 1977 listed some 112 business names in that category. There were 88 such names separating plaintiff Telemed's listing from defendant Tel-Med's listing. The evidence further showed the existence of other programs such as TEL–LAW (for legal information), TEL–ED (for educational information), and TEL–MONEY (for information on money matters), names all obviously adopted with intent to indicate a connection with the telephone. The district court concluded that the evidence adduced at trial demonstrated that plaintiff chose its name and mark to indicate the telephone aspect of its service and its availability to the medical community.[1]

---

1. The district court found both "Telemed" and "Tel-Med" to be merely descriptive. The court found that "TELEMED" was selected as Telemed's name and service mark because it best described the telephone aspect of its service ("tele") and its use by and availability to the medical community ("med"). In addition, the usage of the aforedescribed "optical font" style distinguished Telemed as a computerized operation." The court also found that "[i]nitially San Bernardino Medical Society adopted and used the name Telemed to identify and describe its service program."

■ We cannot say that the district court was clearly erroneous in finding that "Telemed" was merely descriptive, particularly in view of *FS Services, Inc. v. Custom Farm Services, Inc.*, 471 F.2d 671, 674 (7th Cir. 1972), where we found the letters "FS" to be descriptive or generic, saying:

> Further, we agree with defendant that the letters FS have come to signify "farm service" or "farm supply," at least to the farmers within the area in which both parties do business. The words "farm service" or "farm supply" are descriptive or generic terms as to which public policy militates against monopolization of use.

Being merely descriptive, the mark "Telemed" is entitled to protection only if it has acquired a secondary meaning.

### III

■ The district court found that the plaintiff has established "Telemed" as a strong mark and hence protected only when it appears in the distinctive "optical font" typestyle, but that when it appears other than in its optical font logo or simply as a word it is a weak mark. Not only did the plaintiff have the burden of establishing a secondary meaning, but also due to the nature of the mark as a "weak" mark, it had the heavier burden of showing a *strong* secondary meaning.

The connotations this circuit has placed on strong or weak marks was clarified in *Westward Coach Manufacturing Co., Inc. v. Ford Motor Co.*, 388 F.2d 627, 634 (7th Cir.), cert. denied, 392 U.S. 927, 88 S.Ct. 2286, 20 L.Ed.2d 1386 (1968), where we said that "[t]he law protects a trademark only if it is, or has become distinctive" and then quoted the following from 3 R. Callman, Unfair Competition and Trade-Marks § 82.1 (2d ed.):

> In essence, the distinctiveness and popularity of the trade-mark will determine its relative strength or weakness and will accordingly define the scope of protection to be accorded the mark against the confusing similarity of others. A mark is strong if it is conspicuously distinctive; it is distinctive if the public has already

been educated to accept it as the hallmark of a particular source. Then too, a mark can be distinctive either because it is unique, that is, distinctive in itself, because it has been the subject of wide and intensive advertisement, or because of a combination of both. It seems to follow as a necessary conclusion that the trade-mark has the advantage of strength where its owner has invested a considerable amount in advertising or can point to a long period of time during which his mark was used on a great quantity of articles, as symbolic of his business. * * * If the mark is weak, its protection may have an 'extremely narrow scope'; and may indeed be limited to similar goods similarly marketed. Only the strong mark will be protected against infringements arising out of its use in connection with noncompeting goods.

A mark that is strong because of its fame or its uniqueness is more likely to be associated in the public mind with a greater breadth of products or services than is a mark that is weak because it is very much like similar marks. *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 276 (7th Cir. 1976); 572 F.2d 574, 577 (7th Cir. 1978).

Chief Judge Markey of the Court of Customs and Patent Appeals said in *King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 1401 (Cust. & Pat.App. 1974):

> The expressions "weak" and "entitled to limited protection" are but other ways of saying, . . . that confusion is unlikely because the marks are of such non-arbitrary nature or so widely used that the public easily distinguishes slight differences in the marks under consideration as well as differences in the goods to which they are applied, even though the goods of the parties may be considered "related."

■ Here the mark was neither used for a long period of time nor used in connection with a great quantity of goods and services. Furthermore, the mark merely consisted of

the fusion of two extremely common prefixes. As we noted earlier, the words "tele" and "med" are extensively used as a prefix for business and service names. Therefore the mark "Telemed" is not entitled to protection against marks used in related but non-competing services.

The present case is very similar to the facts in the *FS Services* case, *supra*. There, this court found that "FS" in a red and black parallelogram logo was a strong mark but "FS" without the parallelogram was weak. There, as here, the plaintiff was not seeking to prevent the use by another of its registered logo but only seeking to prevent the use of the letters in its symbol. Judge Pell said at 471 F.2d 673:

> [W]e recognize the well-established distinction between strong and weak trademarks: the former merely requiring proof of a likelihood of confusion to establish infringement and the latter requiring proof of a strong secondary meaning in addition to proof of likelihood of confusion.

The plaintiff here had the burden of proving a strong secondary meaning of the word "Telemed" in order to merit protection. The district court was "impelled to conclude plaintiff has failed to establish that its tradename or its service mark has attained a strong secondary meaning in the mind of the public." [2]

Inasmuch as the mark for which the plaintiff sought protection is merely descriptive and also weak and inasmuch as the

plaintiff did not sustain its burden of proving a strong secondary meaning, it follows that it is unlikely that confusion would result.

The district court found that the attempted demonstration of confusion consisted of a showing by the plaintiff of "occasional superficial confusion" and that of that "most was superficial, trivial, and attributable to the error in the listing of defendants' program in the Chicago telephone directory and not because of any palming off or unfair competition on defendants' part." With plaintiff's 125,000 and defendant's 500,000 telephone calls per month, it is remarkable that only a few times was the wrong number called due to the use of "Telemed" and "Tel-Med." In addition, plaintiff adduced testimony that Telemed salesmen and representatives were questioned on occasion, in regard to defendants' Tel-Med program. However, there was no evidence that any person or corporation ever mistakenly purchased defendants' program while intending to purchase plaintiff's service.

The trial court concluded that defendant's use of the term "Tel-Med" did not constitute a violation of either the service mark or tradename infringement laws as alleged in Counts I and II of plaintiff's complaint and that Telemed's claim under Count III for injunctive relief based on dilution under Ill.Rev.Stat., ch. 140, § 22 (1975) is equally without merit.[3]

The district court's judgment is affirmed.

---

2. The district court found and concluded:

> Thus, the critical question becomes whether plaintiff's name and mark, though weak, has attained a strong secondary meaning in the mind of the public. Factors relevant to the issue of whether a name or mark has acquired a secondary meaning are the amount and manner of advertising, volume of sales, length and manner of use, direct consumer testimony and consumer surveys. *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 380 (7th Cir. 1976). To this end, plaintiff's evidence evinced a showing that while it expended sums in excess of $1,000,-000 on advertising, it nevertheless directed this advertising to a class of highly discriminating purchasers, as hereinbefore set forth. Moreover, plaintiff's business has continued to grow during the period from its inception

> through the instant litigation. On the other hand, defendants gear their program not to the discriminating professional but rather to the public in general, especially those members in the lower income, less sophisticated "market". Clearly, the parties herein do not compete in the public market place for prospective customers. Having so found, the court is impelled to conclude plaintiff has failed to establish that its tradename or its service mark has attained a strong secondary meaning in the mind of the public.

3. The court also found that the facts did not support a finding that defendants' use of Tel-Med constitutes a deceptive trade practice under Illinois Law (Ill.Rev.Stat.1975, ch. 121½, §§ 311–17 (1975) ) or that Tel-Med was confusingly similar to Telemed.