**CHICAGO READER, INCORPORATED,**
**Plaintiff-Appellant,**

v.

**METRO COLLEGE PUBLISHING COMPANY, Defendant-Appellee.**

No. 82–2335.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 6, 1983.

Decided July 14, 1983.

See also D.C., 495 F.Supp. 441.

Richard H. Compere, Chicago, Ill., for plaintiff-appellant.

Dennis M. McWilliams, McWilliams, Mann & Zummer, Chicago, Ill., for defendant-appellee.

Before CUMMINGS, Chief Judge, POSNER, Circuit Judge, and NEAHER, Senior District Judge.[*]

NEAHER, Senior District Judge.

This appeal requires us to decide whether the common word "Reader" can be monopolized by trademark registration for the benefit of one newspaper publisher and its licensees, to the exclusion of all others. In agreement with the district court, we answer that question in the negative and affirm its judgment in favor of the defendant-appellee.

Plaintiff-appellant, Chicago Reader, Incorporated ("CRI"), is the publisher of an "alternative" newspaper in Chicago entitled "Reader" which is distributed as "Chicago's Free Weekly."[1] CRI commenced this action for trademark infringement and related statutory and common law claims, alleging that defendant-appellee, Metro College Publishing Company ("MCP"), located in Minneapolis, Minnesota, had intentionally adopted CRI's federally registered tradename "Reader" for the free alternative weekly newspaper MCP publishes and distributes in the Minneapolis-St. Paul area. Our jurisdiction is founded upon 15 U.S.C. § 1121 and 28 U.S.C. § 1338.

After a bench trial on the merits, Judge Flaum granted judgment in favor of defendant but not on its counterclaim for cancellation of CRI's trademark. In extensive findings of fact and conclusions of law the district court essentially held that the particular design form of "Reader" as used in CRI's news-weekly was entitled to trademark protection, but not exclusive rights to the merely descriptive word "Reader" in the context of newspapers. Thus Judge

---

[*] The Honorable Edward R. Neaher, Senior District Judge for the Eastern District of New York, is sitting by designation.

[1] "Alternative" newspapers are weeklies that emerged in the 1970's aimed at college students and urban dwellers in the 18 to 34 age group with spendable income. They are usually circulated to readers without charge, their revenue being derived entirely from advertisers, and feature extensive listing of events, free classified ads, and advertising emphasis on services, boutiques, restaurants and clubs as well as personal journalism and politicization of editorial comment.

Flaum held that MCP's use of "Twin Cities Reader" in a markedly different design form did not infringe CRI's mark, confuse users of the respective publications, or constitute unfair competition or a deceptive trade practice.

## I.

CRI is an Illinois corporation having its principal place of business in Chicago. It began publication of "Reader" on October 1, 1971, with a first run of 51,000 copies. At the time of trial a decade later, circulation had increased to 112,000 copies, all distributed in Chicago except for a few mailed subscriptions. During the same period the newspaper increased in size from an eight-page tabloid to issues of 88 or more pages.[2] Since readers do not pay for the paper, revenue is derived solely from local and national advertisers, solicited by CRI.

MCP's publication, originally entitled the "Entertainer", began circulation in January 1976 in the metropolitan Minneapolis-St. Paul area, primarily directed to college students and selected retail categories frequented by them and other young adults. Its revenue is also substantially derived from advertisers seeking the patronage of such readers. At the time of trial, MCP's publication had a circulation of around 100,-000 copies a week including 300 to 400 mail subscribers. It is not distributed in Chicago or elsewhere.

In January 1977, MCP changed the name of its publication to "twin cities Reader." The word "Reader" appears on the masthead in large rounded solid letters printed in color, only the initial "R" being capitalized, each letter overlapping the next in line, and all bordered heavily in black, conveying an image of letters standing at attention. Above "Reader" are the words "twin cities" in similar but smaller lower case letters, also in color and bordered in black. Below "Reader" appears the phrase

"The . News, Opinion & Entertainment Weekly."

. The seeds of this controversy were planted on May 24, 1978, when CRI applied for federal trademark registration of the word "Reader" in the stylized design form used on its masthead since 1971. That design, as it appears on the Trademark Principal Register, consists solely of the word "Reader" in non-solid, block-type black and white capital letters, the first "R" being reversed and the first "E" connected to the "A", suggestive of Roman lettering. The balance of the masthead consists of two fine black lines below "Reader", as so described, which enclose the date and volume number and the phrase "Chicago's Free Weekly." In contrast to MCP's masthead, CRI's design is printed only in black ink on newsprint.

On February 20, 1979, CRI's application for registration of the mark was granted for newspaper use in Class 16. On March 12, 1979, CRI wrote MCP stating it considered MCP's use of "the trademark 'Reader'" an infringement and unfair competition, and demanding that MCP cease and desist. When MCP did not comply, this action was commenced seeking injunctive relief in addition to treble and punitive damages. MCP responded by asserting various defenses and a counterclaim for cancellation of CRI's trademark on the ground that "Reader" was a generic word which had become descriptive for general readership publications.

## II.

■ CRI's chief contention on this appeal is that the district court erred as a matter of law in holding that CRI had trademark rights only in the design form of "Reader" and not in the word itself. That contention must be rejected in light of our many prior decisions reiterating that a term which is "merely descriptive of the ingredients, qual-

---

**2.** In October 1978 CRI also began publication of a similar "Reader" newspaper in Los Angeles which has a current weekly circulation of 50,000 copies. In addition, it has licensed its trademark to a former employee and investor who has been publishing a "Reader" newspaper in San Diego since October 1972, which has increased its weekly circulation since then to 100,000 copies.

ities, or characteristics of an article of trade" is incapable of being the subject of a valid trademark. *See, e.g., Gimix, Inc. v. JS & A Group, Inc.,* 699 F.2d 901 (7th Cir.1983), citing cases. As we there pointed out:

> "The rationale for prohibiting the appropriation of such a descriptive term as a trademark rests upon the equal right of another individual producing and marketing a similar product to describe his or her product with similar accuracy. Were this right not protected by the law, elements of the language could be monopolized in such a way as to impoverish others' ability to communicate."

699 F.2d at 907. *See also M.B.H. Enterprises, Inc. v. WOKY, Inc.,* 633 F.2d 50, 55 (7th Cir.1980).

Contrary to CRI's contention, the district court was clearly correct in concluding that "Reader" was merely a descriptive term widely associated with a variety of publications, including alternative newspapers. We find no merit in CRI's assertion that the grant of a trademark indicates that the word is suggestive rather than descriptive. As we noted in *Gimix, supra,* we may rely on the dictionary for the common understanding of words. 699 F.2d at 905. In this case we find that the word "reader" denotes not only those who read "newspapers and periodical literature" but also the reading matter itself.[3] And this is confirmed by the variety of publications to which "Reader" in one form or another had been applied, as revealed in the list of titles included in the district court's findings of fact.

■ The district court also correctly concluded that CRI's trademark protection was limited to the particular design form of "Reader" and did not confer a monopoly on the common word itself. That ruling is entirely consistent with our prior decisions in *FS Services, Inc. v. Custom Farm Services, Inc.,* 471 F.2d 671 (7th Cir.1972), and *Telemed Corp. v. Tel-Med, Inc.,* 588 F.2d 213 (7th Cir.1978). Thus in *FS Services,* where we recognized that a plaintiff's strong "FS" trademark derived its distinc-

tiveness from a widely advertised parallelogram motif, we nonetheless also held that "FS" standing alone signified the descriptive terms "farm service" or "farm supply" and had no secondary meaning as such. It was therefore available for the defendant's use in a different logo. 471 F.2d at 673–674. Similarly apposite is our ruling in *Telemed, supra,* where we recognized the distinctiveness of a plaintiff's registered service mark as it appeared in computer "optical font" style. As in *FS Services,* however, we affirmed the district court's findings that apart from Telemed's optical font dress, it was but a descriptive term for medicine by telephone and thus could not bar a defendant's use of the substantially similar term "Tel-Med" for its medical service program. 588 F.2d at 217–20.

■ Finally, the district court correctly concluded that CRI is entitled to continued trademark protection for its particular design of "Reader." As MCP has recognized, a unique design incorporating an unregistrable word may be registered as a trademark for protection against copiers. This is certainly the teaching of *FS Services, supra.* Moreover, in the field of publications it was early recognized that a plaintiff publisher's design or "layout" for "Life" magazine's cover was entitled to injunctive protection compelling another publisher to alter the color of its cover, if it continued to use the word "Life" as a part of its title. This relief was granted although the plaintiff's claim of trademark monopoly on the word "Life" was considered questionable. *See Time, Inc. v. Ultem Publications, Inc.,* 96 F.2d 164, 165 (2d Cir.1938). In a later case, however, the publisher of "Life" magazine was again granted injunctive relief protecting its cover design, even though it did not claim "any exclusive property right in color or in the word 'Life'." *Time, Incorporated v. Motor Publications,* 227 F.2d 954, 955 (4th Cir.1955). There the defendant was permitted continued use of "Car Life" as a title subject to restrictions regarding

---

**3.** See Webster's Third New International Dictionary (1971 ed.), p. 1889.

size or style of type, use of a background rectangle and use of color. *Id.* at 957.

Here, the parties' versions of "Reader" are so distinctively different in design as to obviate any need for protection of CRI's title beyond the trademark rights it already enjoys. There is no likelihood of confusion, as the district court found, since the coupling of "Twin Cities" with "Reader" in MCP's title and the colors and lettering employed clearly distinguish it from CRI's title. Moreover, not only do the parties distribute their respective newspapers in widely separated markets, but the real "consumers" are knowledgeable advertising personnel, and the readership appeal is to the well educated younger generation.

The judgment of the district court is affirmed.