MOTOWN PRODUCTIONS,
INC., Plaintiff,

v.

CACOMM, INC., Defendant,

v.

MOTOWN RECORD CORPORATION, Motown Productions, Inc., and King World Productions, Inc., Counterclaim Defendants.

No. 86 CIV. 6885 (PKL).

United States District Court,
S.D. New York.

Sept. 1, 1987.

---

Corbin Silverman & Sanseverino, New York City, for plaintiff and counterclaim defendants; Marc J. Gottridge, of counsel.

Hedman, Gibson, Costigan & Hoare, P.C., New York City, for defendant; Thomas M. Gibson, of counsel.

## OPINION & ORDER

LEISURE, District Judge:

This action arises out of the parties' uses of the name "Nightlife." Plaintiff/counterclaim defendant Motown Productions, Inc. ("Motown") produces, in association with counterclaim defendant King World Productions, Inc. ("King World"), a nightly television program with that title (the "Motown Program"), starring comedian David Brenner and featuring musician Billy Preston and a band. The Motown Program premiered on September 8, 1986, and has been broadcast on more than 100 over-the-air television stations.

From January to September 1984 and again between April and August 1985, defendant Cacomm, Inc. ("Cacomm") transmitted over a cable television network covering part of New Jersey a low-budget show called "Nightlife" (the "Cacomm Program"). The Cacomm Program consisted almost exclusively of interviews shot with a single camera and taped in Atlantic City, New Jersey. Cacomm removed its show from cable television in August 1985, more than a year before the premiere of the Motown Program.

On September 4, 1986, Motown and King World learned of letters in which counsel for Cacomm demanded that they cease and desist from using the name "Nightlife." On September 5, 1986, Motown commenced this action seeking a declaratory judgment that Cacomm has no exclusive trademark rights in the name "Nightlife." The following week, Cacomm consented to the entry of a preliminary injunction prohibiting it from sending further "cease and desist" letters or otherwise claiming any exclusive right to the "Nightlife" name.

Cacomm filed four counterclaims against Motown, Motown Record Corporation ("MRC"), and King World (hereinafter referred to collectively as the "Motown Parties"). The first counterclaim charges false designation of origin pursuant to Lanham Act § 43(a), 15 U.S.C. § 1125(a). The second and third allege that the Motown Parties' use of the name "Nightlife" constitutes unfair competition under the common law of New York and New Jersey, respectively. The fourth challenges MRC's pending application for a service mark.

The Motown Parties have moved for summary judgment, pursuant to Fed.R. Civ.P. 56, and for the imposition of sanctions, including attorneys' fees and costs, against Cacomm and/or its counsel, pursuant to Fed.R.Civ.P. 11 and Lanham Act § 35(a), 15 U.S.C. § 1117(a). Cacomm has cross-moved for summary judgment and sanctions. The parties have entered into a stipulation with regard to certain facts which are not in dispute. *See* Affidavit of Marc J. Gottridge, Esq., sworn to on January 13, 1987 (the "Gottridge Aff."), Exh. M (hereinafter referred to as the "Stipulation").

## *Discussion*

### I. Lanham Act § 43(a)

In its first counterclaim, Cacomm urges that the use of "Nightlife" as the title of the Motown Program constitutes a false description or representation of origin in violation of Lanham Act § 43(a). Judge Weinfeld has explained,

The [Lanham] Act has been construed to protect the title of a creative work in the limited situation when: (1) the title has acquired 'secondary meaning,' i.e., that the public identifies the title with the plaintiff and his work; and (2) there is a 'likelihood of public confusion,' i.e., that the public will be misled into believing that defendants' work originated or is associated with or sponsored by plaintiff because both works bear the same title.

*Davis v. United Artists, Inc.,* 547 F.Supp. 722, 727–28 (S.D.N.Y.1982) (citations omitted).[1]

## A. Secondary Meaning

### 1. Applicability of Requirement

■ *Cacomm* contends that no showing of secondary meaning is required under § 43(a) because the "creative works" here are series of television programs, rather than individual shows. Defendant's Memorandum of Law at 24, 31–32 (citing *Application of Cooper,* 254 F.2d 611, 617 (C.C.P. A.), *cert. denied,* 358 U.S. 840, 79 S.Ct. 63, 3 L.Ed.2d 75 (1958); *In re Polar Music International AB,* 714 F.2d 1567, 1572 (Fed.Cir.1983)). *Cooper* and *Polar Music* are clearly inapposite, however. Those cases involved series of works where the trademark for the series was not descriptive of any one work and, in addition, each work had an individual name or title. *See Cooper,* 254 F.2d at 615; *Polar Music,* 714 F.2d at 1572. In this case, the individual shows in the Cacomm and Motown series do not have an individual name or title. The name "Nightlife" describes each show, as well as each series as a whole.

1. The *Davis* test is the same as that generally applicable to "descriptive" marks—*i.e.,* "those 'describ[ing] the qualities, ingredients, effects or other features of the product naturally and in ordinary language.'" *Thompson Medical Co. v. Pfizer Inc.,* 753 F.2d 208, 212–13 (2d Cir.1985) (citation omitted).

As the party claiming infringement of an unregistered mark, Cacomm bears the burden of proving that "Nightlife" is a valid trademark, and not "generic" or "descriptive." *See Reese Publishing Co. v. Hampton International Communications, Inc.,* 620 F.2d 7, 11 (2d Cir.1980); *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.,* 753 F.2d 14, 16–17 (2d Cir.1985). "[O]nly where secondary meaning can be established" are descriptive marks eligible for protection; even then, the "ultimate inquiry" is whether there is a likelihood of confusion. *Thompson Medical,* 753 F.2d at 212–13.

The deposition testimony of both Cacomm and Motown witnesses established that the name "Nightlife," as the title of a late night television program, naturally and in ordinary language describes that program as one featuring aspects of "life as lived at night," "the entertainment viewpoint of artists and entertainers entertaining from the casinos at night," and

■ Cacomm also argues that the Motown Parties should be estopped from claiming that "Nightlife" is descriptive because of their pending application to register a service mark containing the name. Defendant's Memorandum of Law at 30. MRC's application, however, seeks protection not merely for the name "Nightlife," but for "Nightlife and Design." Chaum Dep., Exh. 13. Thus, the service application merely signifies that the name "Nightlife," when used with a highly distinctive and fanciful design, may be protected by the trademark laws. *See Chicago Reader, Inc. v. Metro College Publishing Co.,* 711 F.2d 801, 804 (7th Cir.1983) (Neaher, J.).

■ Finally, Cacomm relies on the affidavit of a Chicago lawyer who is reviser of a treatise on trademark law. *See* Defendant's Notice of Motion, Exh. M (Affidavit of Louis Altman, Esq., sworn to on January 19, 1987). The attorney states that the name "Nightlife," as applied to the Cacomm Program, is "suggestive." *Id.* at ———–———. In this Circuit, however, the expert testimony of an attorney as to an ultimate issue of domestic law or as to the legal significance of facts is inadmissible. *Marx & Co. v. The Diners' Club, Inc.,* 550 F.2d 505, 508–11 (2d Cir.), *cert. denied,* 434

"[p]artying, going out, entertainment at night." *See* Deposition of Elliot Chaum (the "Chaum Dep.") at 18; Deposition of Vincent Hartnett (the "Hartnett Dep.") at 145–46; Deposition of Nicholas Mastrorilli (the "Mastrorilli Dep.") at 132. Since it takes no "imagination, thought and perception" to link "Nightlife," as the title of a late night television show, with this concept of entertainment at night, the mark is "descriptive" rather than "suggestive." *See Abraham Zion Corp. v. Lebow,* 761 F.2d 93, 104 (2d Cir.1985). *See also Time, Inc. v. Life Television Corp.,* 123 F.Supp. 470, 474 (D.Minn.1954) ("Life" held not "arbitrary"); *Cowles Magazines & Broadcasting, Inc. v. Elysium, Inc.,* 255 Cal.App.2d 731, 63 Cal.Rptr. 507 (Ct.App.1967) ("Look" held descriptive"); *Time, Inc. v. T.I.M.E., Inc.,* 123 F.Supp. 446, 455 (S.D.Cal.1954) ("Time" held "descriptive").

(Unless otherwise indicated, citations to transcripts of depositions and deposition exhibits refer to a collection of material filed by the Motown Parties entitled, "Excerpts from Depositions and Selected Deposition Exhibits Relevant to Motion of Motown, MRC, and King World for Summary Judgment and for the Imposition of Sanctions.")

U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977). *Accord United States v. Sprogis,* 763 F.2d 115, 123 (2d Cir.1985). Accordingly, the Altman affidavit may not be considered on the instant cross-motions. *See* Fed.R.Civ.P. 56(e).[2]

### 2. Cacomm's Evidence

■■■ " '[P]roof of secondary meaning entails [r]igorous evidentiary requirements.' " *Thompson Medical Co. v. Pfizer Inc.,* 753 F.2d 208, 217 (2d Cir.1985) (citation omitted). The most important indicia of secondary meaning are advertising expenditures, consumer studies linking the name to a source, sales success, unsolicited media coverage of the product, attempts to plagiarize the mark, and length and exclusivity of the mark's use. *Id.* (citations omitted). Each of these factors militates against Cacomm's claim.

First, Cacomm expended a total of no more than $14,000 on advertising for its program over a period of more than a year and a half. There is no evidence that Cacomm's minimal advertising was effective in developing secondary meaning. *See McGregor-Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1133 n. 4 (2d Cir.1979). Such "meager promotional expenditures" weigh in favor of a finding of no secondary meaning. *H. Lubovsky, Inc. v. Esprit de Corp.,* 627 F.Supp. 483, 487 (S.D.N.Y.1986).

Second, defendant has failed even to undertake a consumer survey concerning the public perception of the Cacomm Program and its source. Mastrorilli Dep. at 121–22. *Compare American Footwear Corp. v. General Footwear Co.,* 609 F.2d 655, 663 (2d Cir.1979) (finding survey results insufficient to establish secondary meaning), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980).

Third, Cacomm performed no surveys to test the size of its viewing audience. Mastrorilli Dep. at 102–06. Even accepting Cacomm's own dubious estimates, however, the Cacomm Program had only 6,210 viewers. *Id.* at 108–09, 113; Stipulation at ¶ 90. The deposition testimony reveals, moreover, that Cacomm "pulled" the show from New Jersey cable television in August 1985 for lack of any advertisers, and was unable in the following months to obtain any new sponsors. Mastrorilli Dep. at 171–72, 181–82; Hartnett Dep. at 269–71. Thus, for the one year period preceeding the premiere of the Motown Program, Cacomm had no "sales." This factor weighs heavily against a finding of secondary meaning, even in the limited geographical area where Cacomm's program was transmitted. *See Abraham Zion Corp. v. Lebow,* 761 F.2d 93, 105 (2d Cir.1985) (citing plaintiff's "small and declining share of the market").

Fourth, Cacomm is unable to offer any evidence of "unsolicited" media coverage of its program. *See Thompson Medical,* 753 F.2d at 217. It points to a total of three items, each of which was the direct result of a press release or promotional effort. Hartnett Dep. at 235–36 & Exh.'s 9–11. Moreover, the most recent of these instances of media coverage occurred in December 1984—21 months before the Motown Program first appeared. *See Le Sportsac, Inc. v. Dockside Research, Inc.,* 478 F.Supp. 602, 608 (S.D.N.Y.1979) (secondary meaning required at time when alleged infringer entered the market).

Fifth, there is no evidence of plagiarism by "conscious imitation" or "intended similarity." *See, e.g., Harlequin Enterprises Ltd. v. Gulf & Western Corp.,* 644 F.2d 946, 949 (2d Cir.1981). In fact, defendant has not shown that the Motown Parties were aware of the Cacomm Program when they named their production.

Finally, the "length and exclusivity" of Cacomm's use of the mark is unimpressive. *See, e.g., Vitarroz Corp. v. Borden, Inc.,* 644 F.2d 960, 968 (2d Cir.1981) (citing various prior uses of mark). Cacomm only used the name "Nightlife" during a seven-month period of 1984 and a four-month

---

**2.** In its attempt to demonstrate that "Nightlife" is "suggestive," rather than "descriptive," Cacomm also relies on certain portions of the deposition of the President of Domestic Television Distribution for King World. Defendant's Memorandum of Law at 31 (citing Defendant's Notice of Motion, Exh. R (Deposition of Sidney Cohen) at 67–68). This testimony fails to support defendant's claim.

period of 1985, and its program did not appear every night, or even every week, during those periods. Hartnett Dep., Exh. 2; Mastrorilli Dep., Exh. 25; Stipulation at ¶ 64. Further, the name "Nightlife" has appeared as the title of a series on a New Jersey public television network, a series on the ABC television network and various other broadcasts, motion pictures, and plays. Gottridge Aff. at ¶ 15 & Exh. V; Deposition of Burl Hechtman, Exh. 4; Chaum Dep., Exh. 14.

Cacomm argues that it has the "exclusive right" to use the name "Nightlife" because it was supposedly the first user of the name. Defendant's Memorandum of Law at 39–40. Even assuming a factual basis for this argument, the law in this Circuit does not support Cacomm's position. "[P]rior use of a trademark does not automatically entitle the first user to bar its use by others." *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 48 (2d Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). The Court "must look not merely to the age of the competing trademarks, but to a host of other factors." *Id.* at 47. As discussed below, each of such factors weighs against Cacomm's claim under § 43(a).

### B. Likelihood of Public Confusion

■ The Court has viewed four exhibits submitted by the parties—one tape of the Motown Program and three tapes of the Cacomm Program. Even a brief look at the two programs establishes beyond doubt that no "purchaser," whether it be a programming executive, potential advertiser, or ordinary television viewer, could confuse the sources of the two versions. *See Mushroom Makers*, 580 F.2d at 47 (likelihood of confusion deemed the "crucial issue"). The Motown Program is a slick, network-quality production resembling such well-known programs as "The Tonight Show" with Johnny Carson and "Late Night" with David Letterman. The Cacomm Program, by contrast, is an amateurish, one-camera, interviews-only production.

Not surprisingly in view of this comparison,[3] this case presents the unusual situation where not one of *Polaroid* factors supports a finding of likelihood of confusion. *See Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); *Thompson Medical*, 753 F.2d at 213–14.

### 1. The Weakness of Cacomm's Mark

Cacomm's argument that its mark is "strong" is based exclusively on its incorrect classification of "Nightlife" as "suggestive," rather than merely "descriptive." Defendant's Memorandum of Law at 49. In any event, however, a mark is not deemed "strong" merely because it is categorized a "suggestive." *See, e.g., C.L.A. S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 17 (2d Cir.1985). In *C.L.A.S.S. Promotions*, the Court of Appeals for the Second Circuit found the mark "CLASS," in the title of a magazine, to be weak because the magazine's actual distribution was narrow and there was no evidence that the mark was associated in the public's mind with the magazine or its publisher. *Id.* at 16–18. Similarly, in this case the actual distribution of the Cacomm Program was extremely narrow. By its own estimate, the Cacomm Program was watched by no more than 6,210 people. Stipulation at ¶ 90. Moreover, there is no evidence that a single member of the public ever associated the word "Nightlife" with the Cacomm Program or Cacomm itself.

### 2. The Dissimilarity of the Marks as Used

In assessing the similarity of two marks, the Court must focus not merely on the names; rather, the emphasis should be on "the general impression conveyed to the purchasing public by the respective marks." *C.L.A.S.S. Promotions*, 753 F.2d at 18. In addition, " '[t]he setting in which a designation is used affects its appearance and colors the impression conveyed by it.' " *McGregor-Doniger*, 599 F.2d at 1133 (cita-

---

**3.** Under the *Polaroid* analysis, this comparison is known as the "proximity of the products" factor. *See Narwood Productions, Inc. v. Lex-* *ington Broadcast Services Co.*, 541 F.Supp. 1243, 1250 (S.D.N.Y.1982).

tion omitted). Motown and King World have widely used "Nightlife" with a highly distinctive logo, while Cacomm admittedly used no logo or design. Chaum Dep., Exh. 13 at 12; Mastrorilli Dep. 158–59; Affidavit of Teri Schaffer, sworn to on December 8, 198[6] (the "Schaffer Aff."), Exh.'s A & B. Moreover, Cacomm has not used the mark since August 1985, and the Motown Program did not premiere until September 1986. The use of different media is also significant. The Cacomm Program was shown only by a local New Jersey cable company, while the Motown Program has been broadcast coast to coast on major network affiliates and independent stations.

### 3. Cacomm Cannot 'Bridge the Gap'

Cacomm tries to satisfy this *Polaroid* factor by explaining that "there has always been an intent to carry the 'Nightlife' program forward into whatever vehicle was available...." Defendant's Memorandum of Law at 61. Cacomm omits to state that all such efforts have failed because the national cable networks were not interested in Cacomm's low-quality product. Cacomm's wishful thinking is not enough. The pertinent question is whether there is a "likelihood" that Cacomm will enter the market occupied by the Motown Parties. *See, e.g., Lever Bros. Co. v. American Bakeries Co.*, 693 F.2d 251, 258 (2d Cir. 1982). The evidence makes it clear that such an occurrence is not even a remote possibility.

### 4. Actual Confusion

Cacomm concedes that not a single "purchaser" has been confused. Defendant's Memorandum of Law at 61–62; Hartnett Dep., Exh. 16 at 5. Moreover, Cacomm has failed even to undertake a survey of the public concerning the two uses of "Nightlife" at issue. Mastrorilli Dep. at 121–22. *See Mattel, Inc. v. Azrak-Hamway International, Inc.*, 724 F.2d 357, 361 (2d Cir. 1983).

### 5. Good Faith

Motown and King World have demonstrated good faith, which is an important equitable factor for consideration by the Court. *See Narwood Productions, Inc. v. Lexington Broadcast Services Co.*, 541 F.Supp. 1243, 1252 (S.D.N.Y.1982). Two thorough surveys (which did not disclose Cacomm's unregistered and almost completely unpublicized use of the "Nightlife" name) were undertaken and reviewed before the Motown Program was taped. In addition, Motown and King World received from three experienced lawyers the advice "that the title was in the public domain and available for use." *See Kirkland v. National Broadcasting Co.*, 425 F.Supp. 1111, 1117 (E.D.Pa.1976), *aff'd*, 565 F.2d 152 (3d Cir.1977). Moreover, all this occurred after an earlier title suggestion had been dropped "because of the existence of prior registrations which were, in the opinion of counsel, too close for comfort." *See Lever Bros.*, 693 F.2d at 258.

### 6. Difference in Quality

Cacomm does not dispute that the Motown Program "is vastly superior in quality to Cacomm's Program and has gained considerably greater viewer acceptance." Plaintiff's Memorandum of Law at 70–71; Defendant's Memorandum of Law at 65. Therefore, Cacomm's reputation could not conceivably be tarnished by the Motown Program. *See Lever Bros.*, 693 F.2d at 258.

### 7. Sophistication of Purchasers

Another factor considered under the *Polaroid* test is the relative sophistication of the consumers involved. *Narwood Productions*, 541 F.Supp. at 1250–51. Ignoring the sophistication of television programming executives and advertisers, Cacomm asserts that in this case "the 'purchasers' must be considered as essentially unsophisticated." Defendant's Memorandum of Law at 66. The two programs, however, are so different in content and quality thay there is no likelihood of confusion even among ordinary television viewers. No significant number of viewers could confuse the $10 million Motown production, featuring a well-known comedian as host, a band under the direction of a prominent popular musician, and a variety of entertainment, with Cacomm's $54,000 series, consisting solely of one-camera, "talking heads" interviews conducted by

two unknowns. It bears repeating that the Cacomm Program had not been shown or promoted to the public over any medium for 13 months before the premiere of the Motown Program.

8. Balance of Hardships and Benefits

The final *Polaroid* factor is "the question of the benefits [Cacomm] would obtain from the granting of injunctive relief as against the probable harm such relief would cause" the Motown Parties. *See King Research, Inc. v. Shulton, Inc.*, 454 F.2d 66, 69 (2d Cir.1972). The balance of hardships is clear in this case. Motown and King World have invested nearly $12,-000,000 in a major television series which has been shown on more than 100 television stations from coast to coast. Cacomm, by contrast, has not transmitted its program anywhere since August 1985, when it removed the show from New Jersey cable television due to a lack of sponsors.

Cacomm does not contest the harm that the injunction it seeks would cause to the Motown parties. Nor does it point to any evidence that it would be injured if the Motown Parties were not enjoined. Cacomm simply asks the Court to infer that it has suffered irreparable injury from its supposed showing of "an extremely strong likelihood of confusion." Defendant's Memorandum of Law at 67. As the foregoing discussion makes clear, however, Cacomm has established no basis for such an inference. The injunction that Cacomm seeks would confer no concrete benefit upon it and would significantly impair the value of the Motown Parties' substantial investment. *See Nina Ricci, S.A.R.L. v. Gemcraft Ltd.*, 612 F.Supp. 1520, 1531 (S.D.N.Y.1985).

In sum, each of the factors considered under *Polaroid* and its progeny negates the conclusion that "an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *See Mushroom Makers*, 580 F.2d at 47 (citation omitted).[4]

II. State Common Law

■ In its second counterclaim, Cacomm alleges that the conduct of the Motown Parties constituted unfair competition under the common law of New York. In its third counterclaim, Cacomm alleges that the Motown Parties committed unfair competition and trademark infringement under the common law of the New Jersey. Under New York law, Cacomm must show that it had developed for its mark a secondary meaning and that consumers were likely to be confused about the source of the parties' programs. *See Mattel*, 724 F.2d at 360–61; *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 543, 399 N.Y.S.2d 628, 631, 369 N.E.2d 628 (1977). Under New Jersey law on unfair competition and trademark infringement, the test for claims involving parties' uses of the same name " 'is the likelihood of confusion or deception among actual or prospective consumers of the plaintiff.' " *Estate of Presley v. Russen*, 513 F.Supp. 1339, 1372 (D.N.J.1981) (citation omitted). *See also Eagle Snacks, Inc. v. Nabisco Brands, Inc.*, 625 F.Supp. 571, 579 (D.N.J. 1985) (Lanham Act analysis applied to New Jersey common law claims). Cacomm concedes, in fact, that Lanham Act principles apply to its New York and New Jersey common law claims. Defendant's Memorandum of Law at 69, 71.

---

4. Cacomm contends that excerpts from the Cohen deposition support a finding of likelihood of confusion. Defendant's Memorandum of Law at 45. In fact, however, a fair reading of the deposition transcript makes clear that the cited testimony concerns a hypothetical set of facts unlike those in this case. *See* Defendant's Notice of Motion, Exh. R at 67–70.

Cacomm also relies on an alleged "determination" by a trademark attorney employed by the Patent and Trademark Office to support its claim of a "likelihood of public confusion." De-

fendant's Memorandum of Law at 45–48. Even assuming that the trademark attorney had adequate knowledge of the relevant facts, the "Office Action" letters to which Cacomm refers do not constitute a final decision either to register or to refuse to register a trademark. *See* Defendant's Notice of Motion, Exh.'s P & Q. Accordingly, there is no Patent and Trademark Office "determination" requiring deference by the Court. *See, e.g., Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 11 (2d Cir. 1976).

In summary, Cacomm may not prevail on its first, second, and third counterclaims because, as a matter of law, it is unable to prove secondary meaning or likelihood of public confusion. Accordingly, Cacomm's first, second, and third counterclaims are hereby dismissed.

### III. Fourth Counterclaim

■ In its final counterclaim, Cacomm alleges that MRC improperly filed its application with the Patent and Trademark Office in May 1986 before the service mark had actually been used in commerce. Cacomm states that there was no "use" until September 8, 1986, when the Motown Program premiered, because a service mark is not "in use" until there is an "open and notorious public offering of those services to those for whom the services were intended." Defendant's Memorandum of Law at 72. Long before the application was filed, however, King World used the mark in aggressively promoting the Motown Program to television executives and advertisers. *See, e.g.,* Chaum Dep. at 22–23; Shaffer Aff., Exh. A; Affidavit of Sidney Cohen, sworn to on January 7, 1987, at ¶ 6 & Exh. D. Since these groups are among the "purchasers" of the program, MRC's mark was "displayed" and "in use" as early as October 1985. *See* 15 U.S.C. § 1127 at ¶ 15. *See also Stock Pot Restaurant, Inc. v. Stockpot, Inc.,* 737 F.2d 1576, 1579 (Fed. Cir.1984); *Aluminum Fabricating Co. v. Season-All Window Corp.,* 160 F.Supp. 41, 45 (S.D.N.Y.1957), *aff'd,* 259 F.2d 314 (2d Cir.1958). Accordingly, Cacomm's fourth counterclaim is hereby dismissed.

### IV. Plaintiff's Amended Complaint

From the preceding discussion, it follows that Cacomm has no exclusive trademark rights in the name "Nightlife." Accordingly, summary judgment is hereby granted in favor of Motown on its Amended Complaint. The Court will enter a declaratory judgment establishing that Cacomm has no such rights and permanently enjoining Cacomm from making claims of any such rights. *See, e.g., Muller v. Olin Mathieson Chemical Corp.,* 404 F.2d 501, 504–05 (2d Cir.1968). Motown is hereby directed to submit to the Court a proposed judgment in conformity with this opinion within 10 days from the date hereof.

### V. Sanctions

Under Fed.R.Civ.P. 11, sanctions must be awarded when "[i]t is patently clear that [a party] had absolutely no chance of success under existing precedents, and no reasonable argument has been advanced to extend, modify or reverse the law as it stands." *Norris v. Grosvenor Marketing Ltd.,* 803 F.2d 1281, 1288 (2d Cir.1986) (citing *Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 254 (2d Cir. 1985) ("*Eastway I*")). *See also Oliveri v. Thompson,* 803 F.2d 1265, 1275 (2d Cir. 1986), *cert. denied,* — U.S. —, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987). In this case, Cacomm's counterclaims are governed by well-settled principles. Application of those principles to the facts reveals an extreme circumstance: None of the relevant factors used to determine either secondary meaning or likelihood of confusion supports Cacomm's position.

A "reasonable inquiry," *see* Fed.R.Civ.P. 11, would have revealed this conclusion to Cacomm's counsel, Thomas M. Gibson, Esq. The facts pertinent to the "secondary meaning" and "likelihood of confusion" issues were clearly available to Cacomm and its counsel. Gibson had represented Cacomm for some six weeks before the counterclaims were filed, and had consulted with its two principals about the counterclaims. Mastrorilli Dep. at 155. Moreover, by the time the counterclaims were filed, Motown and King World had produced documents to Gibson, and he had the benefit of papers submitted in support of plaintiff's application for a preliminary injunction, which disclosed most of the basic facts about the Motown Program. Gottridge Aff. at ¶ 11; Cohen Dep., Exh. 22. Gibson also had the benefit of his own client's investigation. Mastrorilli Dep. at 16–22, 31; Hartnett Dep. at 227–33. Finally, as early as September 8 and 9, 1986, this Court explicitly warned Gibson that "the obligations of Rule 11 would be enforced to the fullest in this case." *See Royal Anchor, Inc. v. Tetra Finance (HK)*

*Ltd.*, [1985–86 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 92,432 at 92,648 (S.D.N.Y. Jan. 3, 1986) [Available on WESTLAW, DCT database]. *See also* Gottridge Aff., Exh. Q at 5–7, 11, 14, 15, 23 & Exh. R at 8–9.

Lanham Act § 35(a), 15 U.S.C. § 1117(a), may provide a separate basis for the award of sanctions. Under the statute, the Court may award "reasonable attorney fees" where the losing party acted in bad faith. *Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 77 (2d Cir.), *cert. denied*, — U.S. ——, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986).[5] In this case, the tactics employed by Cacomm's counsel smack of bad faith. Any doubt on this score is removed by a review of of Cacomm's baseless cross-motion for sanctions against the Motown Parties pursuant to Rule 11 and § 35(a).

The Motown Parties seek reimbursement of their attorneys' fees and costs incurred after September 8, 1986. Plaintiff's Memorandum of Law at 82. The Court has concluded that an award is warranted under both Rule 11 and § 35(a). The Court recognizes, however, that substantial fees and costs would have been incurred by Motown in bringing a summary judgment motion on the Amended Complaint even if Cacomm had not asserted counterclaims.[6] Moreover, the Court has taken into consideration the circumstances of this case indicating that Cacomm's counsel, rather than defendant itself, was primarily responsible for the assertion of counterclaims. *See* Mastrorilli Dep. at 155. *See also Eastway I*, 762 F.2d at 254 n. 7 (noting district court's "broad discretion in fashioning sanctions, and apportioning fees between attorney and client"); *Eastway Construction Corp. v. City of New York*, 821 F.2d 121, 124 (2d Cir.1987) (*"Eastway II"*) (Allocation of fee award between party and

counsel normally "is a task within the discretion of a district court."). Accordingly, the Court will award only that portion of the Motown Parties' fees that it considers "reasonable to serve as a sanction." *See Eastway II*, 821 F.2d at 123.

 The Motown Parties' motion for sanctions is hereby granted. Cacomm is ordered to pay the Motown Parties the sum of $500. Cacomm's counsel is ordered to pay the Motown Parties, without reimbursement from Cacomm, the sum of $4500. A certificate of compliance shall be filed with the Court within 10 days from the date hereof.

SO ORDERED.

---

**5.** "It is not settled in this circuit whether relief under section 35 of the Lanham Act, 15 U.S.C. § 1117 ... is also available for ... infringement in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)." *Oral–B Laboratories, Inc. v. Mi-Lor Corp.*, 810 F.2d 20, 25 (2d Cir.1987) (citing *Burndy Corp v. Teledyne Industries*, 748 F.2d 767, 771–72 (2d Cir.1984)). *See also Yeshiva University v. New England Educational Institute*, 631 F.Supp. 146, 147 (S.D.N.Y.1986) (applying § 35(a) remedies to case of unregistered

mark); *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 652 F.Supp. 1105, 1114–15 (S.D.N.Y.1987) (same).

**6.** In fact, in support of its motion for summary judgment on the Amended Complaint, Motown relies on its briefing of the issues involved in Cacomm's counterclaims. Plaintiff's Memorandum of Law at 78.