Richard A. DIETER, d/b/a Shutter-world, and Richard A. Dieter General Contractor, Inc., Plaintiffs,

v.

B & H INDUSTRIES OF SOUTHWEST FLORIDA, INC., Defendant.

No. 87–32–Civ.–Ft.M–15C.

United States District Court,
M.D. Florida,
Fort Myers Division.

April 6, 1988.

David W. Pettis, Jr., Pettis & McDonald, Tampa, Fla., for plaintiffs.

Merrill N. Johnson, Naples, Fla., for defendant.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

MILES, Senior District Judge.[*]

The case now before the Court involves a trademark dispute. Plaintiffs Richard A. Dieter and Richard A. Dieter General Contractor, Inc. (collectively referred to as plaintiff Dieter) allege that defendant has infringed upon Dieter's right to use the name "Shutterworld." Plaintiff has sued under two provisions of the federal Lanham Act, 15 U.S.C. §§ 1114, 1125(a); under the Florida common law of unfair competition; and for damage to business reputation under Fla.Stat.Ann. § 495.151. He seeks a permanent injunction against defendant's use of the word; he also seeks an accounting for profits, treble damages, and attorney's fees.

Trial in this case was held before the bench. The Court's findings of fact and conclusions of law under Fed.R.Civ.P. 52(a) follow.

*Findings of fact*

1. Plaintiff Dieter is the president and sole shareholder of plaintiff Richard A. Dieter General Contractor, Inc., a Florida corporation (Dieter, Inc.). Dieter, Inc. has its headquarters in the Tampa Bay area, and it does business under the name "Shutterworld." Shutterworld assembles, distributes and deals in various types of shutters, including pre-hung wooden shutter assemblies. According to the testimony of plaintiff Dieter, Shutterworld sells its shutters through approximately 300 dealers, located along the west coast of Florida between New Port Richey and Naples. It also sells directly to customers from its two retail outlets, which are located in Tampa and in Largo, Florida.

2. In 1976 plaintiff applied for federal registration of a trademark incorporating the name "Shutterworld." The mark consists of the name in script form, superimposed on a large letter "O." *See* appendix 1. Plaintiff was granted registration number 1,062,778 on April 5, 1977 for use of the mark on "pre-hung wooden shutter assem-

---

* Wendell A. Miles, Senior District Judge, Western District of Michigan (sitting in the Middle District of Florida as Visiting Judge on Intercircuit Assignment).

blies." *See* plaintiff's exhibit 1. The registration states that plaintiff first used the mark in 1970, and that he first used the mark in commerce in 1974. *See id.*

In 1983, plaintiff supplemented his federal registration with a "combined sections 8 & 15 declaration," filed on behalf of plaintiff's business by Janet E. Hudson as secretary-treasurer. The declaration stated that "Shutterworld, Inc., a Florida corporation" was owner of federal registration number 1,062,778. It stated that the registered mark had been in continuous use in interstate commerce for "pre-hung wooden shutter assemblies" since April 5, 1977, and that the mark was still so used. *See* defendant's exhibit 20.

Dieter never sought nor obtained registration of his trademark pursuant to Florida law. However, he did file an affidavit for registration of a fictitious trade name, pursuant to Fla.Stat. § 865.09, in Pinellas County in September of 1971. *See* defendant's exhibit 8. The affidavit was executed by plaintiff Dieter, president of Dieter, Inc., and stated that Dieter, Inc. was doing business under the fictitious name "Shutter World." *Id.*

3. The plaintiff deals primarily in decorative wooden shutters that are intended for indoor use. The various models include shutters with small louvers ("regular slatted" models), shutters with wide louvers, and "fabric frame" shutters without louvers. Plaintiff testified that he deals also in exterior shutters. He sells exterior models made out of wood, aluminum, or synthetic materials, called "Bahamas" or "colonials." These shutters are intended for protection from hurricanes as well as for decoration. The plaintiff testified that he carries all types of hurricane-proofing materials for sliding doors. He also stated that he recently began to carry "roll-up" security shutters.

The wooden interior shutters that plaintiff carries are manufactured at plaintiff's headquarters in Largo. Plaintiff also has a manufacturing location in Fayette, Missouri. The operation in Missouri consists primarily of the ripping and finishing of materials for the shutter frames; plaintiff testified that a few sales of wooden shutters are made from that location.

Plaintiff does not manufacture any of the exterior shutters that he sells. These shutters are purchased from independent suppliers and resold under the name "Shutterworld."

4. Plaintiff sells his products to dealers, to builders, and directly to the public. He frequently provides delivery of the shutters, and offers an installation service. Many of the dealers to whom plaintiff sells are interior decorators, who include plaintiff's interior shutters in their job estimates. Plaintiff provides shutters either unfinished, or finished with paint or stain. Dieter testified at trial that 75% of the wooden shutters that he sells, either through dealers or from one of his retail outlets, have been painted or stained.[1]

Plaintiff's two retail outlets are located in the Tampa–St. Petersburg area, in Pinellas and Hillsborough counties. In 1976 and 1977, plaintiff had a retail outlet in the town of Osprey, a short distance south of Sarasota. He closed this outlet because of staffing problems and to avoid competition with his dealers in the area. Plaintiff identified two interior decorators in the Fort Myers–Naples area that frequently sell his products: David's Interiors of Fort Myers and Port Charlotte, and Interiors by Tilley of Naples.

5. Plaintiff testified that since the mid-seventies, he has labelled most of the wooden shutters that he sells with his registered trademark. The mark is burned into the wooden shutters, where it leaves an indelible impression in dark letters. *See* plaintiff's exhibit 2 (sample of wood branded with "Shutterworld" mark). Plaintiff stated that in "most cases" in which he uses the trademark, the name is followed by the circled letter "R" that denotes a registered trademark. *See, e.g.* appendix 1.

---

**1.** One of plaintiff's dealers testified at the trial that 95% of the shutters he received from plaintiff had been painted.

Plaintiff testified that shutters not manufactured by him are labelled with a small silver sticker marked with the name "SHUTTER–WORLD" in plain block letters, hyphenated. *See* plaintiff's exhibit 3.

There was some dispute at trial regarding the extent to which plaintiff continues to mark his products with the registered "Shutterworld" design. Dieter stated at trial that almost all of the wooden shutters manufactured by him are branded with the registered "Shutterworld" mark. He testified that the only shutters not so marked are ones used as samples or demonstration models. Defendant, however, presented testimony to refute this. Two witnesses, employees of B & H, testified that they had visited plaintiff's Tampa store on one occasion in April of 1987. Each stated that they had inspected all of the shutters contained in the store, and had found none with the "Shutterworld" brand or a "Shutterworld" label. Another witness stated that he had visited plaintiff's Largo store in November of 1987. He testified that of the shutters he saw there, "some" had been branded with the trademark, while others had not. He also stated that none of the exterior shutters in the shop bore any mark or label indicating that they were from "Shutterworld." The pair of shutters purchased by that witness at the Largo store were present in court; the registered "Shutterworld" design was absent from them. *See* defendant's exhibits 1, 2.

Plaintiff called as a witness David Snyder, an interior designer from the Fort Myers area who deals in plaintiff's interior shutters. Snyder testified that the shutters he sold for plaintiff carried the registered "Shutterworld" mark. He also stated that even when a shutter had been painted the trademark was still visible. Defendant moved into evidence a small piece of wood, branded with the "Shutterworld" mark, which had been spray-painted by one of its witnesses. *See* defendant's exhibit 4. This exhibit was intended to support defendant's contention that paint makes the trademark invisible.

The Court has examined defendant's exhibit 4 and concludes that two coats of paint detract from the visibility of plaintiff's trademark. *Compare* plaintiff's exhibit 2 (wood branded with trademark, unpainted) *with* defendant's exhibit 4 (wood branded with trademark, painted). However, painting does not obliterate the mark entirely.

6. Plaintiff has made extensive use of the name "Shutterworld" in forms other than the registered design. The name "Shutterworld" is used on large signs and awnings at both the Tampa and Largo retail outlets. At each of these locations, the name appears in plain block letters and as a single, unhyphenated word. *See* plaintiff's exhibits 4, 5 (photographs of plaintiff's storefronts in Tampa and Largo). The name appears on plaintiff's delivery truck, again in block letters, this time superimposed on a depiction of the globe. *See* plaintiff's exhibit 6. It is used on plaintiff's letterhead, in a script form similar to that in the registered version but without the large "O" that forms part of the registered design. *See* exhibit 3, defendant's brief in opposition to plaintiff's motion for summary judgment (affidavit of Hollis Myers). The name has been used in plain block letters in advertisements appearing in various media. *See* plaintiff's exhibit 8 (ad in North County Home Owners Manual); exhibit 9 (ads from Tampa, St. Petersburg & Sarasota newspapers); exhibit 7 (ad from Sunday television listings, St. Petersburg Times); exhibit 10 (ad from Tampa yellow pages, telephone listings). At both the Tampa and Largo locations, the telephone is answered with the identification "Shutterworld."

7. Plaintiff since the mid-seventies has bought newspaper and telephone book advertising in the Tampa–St. Petersburg area. Since that time he has placed ads in the St. Petersburg Times and Tampa Tribune (Sunday television sections). Before the Osprey store was closed in 1977, plaintiff advertised in the Sarasota Herald Tribune. His advertisement appears in the yellow pages (telephone directory) for Clearwater, St. Petersburg, Sarasota, Palmetto, Lakeland, New Port Richey, Tampa, and other areas in the vicinity (Pinellas, Hillsborough and Pasco counties). Plaintiff's

telephone book advertisements appear under the listing for "shutters." In all of the newspaper and telephone book ads, plaintiff's product is identified with the single word "Shutterworld" in block letters.

8. Plaintiff's gross sales of shutters for fiscal years 1982 through 1986 were as follows:

| | |
|---|---|
| 1982 | $183,959 |
| 1983 | $212,455 |
| 1984 | $274,124 |
| 1985 | $265,690 |
| 1986 | $350,000 |

*See* defendant's exhibit 7 (Dieter's answers to defendant's interrogatories).

In 1987, plaintiff spent between $14,000 and $15,000 on advertising.

9. Defendant B & H Industries has been engaged in the shutter business under the name "Shutterworld" since 1983 or 1984. Defendant's headquarters is located in Fort Myers, which is approximately 120 miles south of Tampa and Largo. Before using the name "Shutterworld," B & H did business in the Fort Myers area as "Gary's Hurricane Shutter Center."

Defendant sells a product that was described at trial as an insulated roll-down security shutter. This shutter is designed primarily for exterior installation. It provides protection from hurricanes and intruders, but is not intended for decoration.

10. In early advertisements, defendant used the name "Shutterworld" in conjunction with the slogan "a name you can rely on." *See* plaintiff's exhibit 15. Defendants later substituted the term "the roll shutter leader." According to Schoonover, Hoovis created this slogan to eliminate the possibility that the name would be identified with products other than roll-down shutters. *See, e.g.,* plaintiff's exhibits 12, 13, 14 (ads using phrases "the roll shutter leader" and "call the roll shutter leader").

Defendant obtained Florida registration of the phrase "Shutterworld, a name you can rely on" and accompanying design on February 7, 1984. *See* defendant's exhibit 11. The registration reflects that defendant first used the mark in September of 1983. The design as registered includes the name in "neon sign" typeface, with an oversized letter "O," and a stylized form of the letters "SW" in three-line script against a dark background. *See id.* At the time of state registration of the mark, defendant was told that the name "Shutterworld" had not previously been registered in Florida and was available for its use.

11. Defendant sought federal registration of the "Shutterworld" name and logo in 1986. The mark submitted to the U.S. Patent and Trademark Office at that time differed slightly from the state-registered mark. Defendant retained the name "Shutterworld" in neon sign lettering, but placed the separate "SW" motif inside the large "O" in the word itself. The phrase "the roll shutter leader" was substituted for "a name you can rely on." *See* appendix 2. The trademark application stated that defendant intended to use the mark on "roll-up security shutters." Defendant's exhibit 21.

12. Federal registration of defendant's mark originally was refused because of the likelihood of confusion with plaintiff's registered mark number 1,062,778. *See id.* Defendant amended its application for registration, submitting an affidavit and pictorial evidence to support its claim that there was a lack of confusion between its mark and plaintiff's. The mark thereafter was deemed apparently "entitled to registration," and was published pursuant to statute. *See id.* Plaintiff has filed an opposition to registration of defendant's mark.

13. Defendant uses the term "Shutterworld" to identify its business, *see* plaintiff's exhibit 12; it also affixes labels containing its "Shutterworld" mark to the roll-down shutters themselves. *See* plaintiff's exhibit 11; defendant's exhibit 13 (tag applied to shutters; contains words "Shutterworld/the roll shutter leader"). Defendant places the labels on the bottom slat of the shutters. *See* defendant's exhibit 10 (sample of roll-down shutter sold by defendant). The mark is used on defendant's business

cards. *See* plaintiff's exhibits 20, 21, 22 (mark reads: "Shutterworld/a name you can rely on"). Schoonover testified at the trial that defendant never intentionally uses the word "Shutterworld" unless it is accompanied by the slogan ("the roll shutter leader"), and in stylized form.[2]

14. Defendant does not maintain its own storefront for sales of its product. Rather, defendant's products are on display at several independent "home improvement centers" located in the nearby communities of Naples, Venice and Port Charlotte. Most of defendant's sales are made directly to homeowners. Sales representatives call at a customer's home, where they describe the features of defendant's product and explain the benefits of local custom installation.

15. Defendant advertises its product via several media in the Fort Myers area. It has purchased ads in the Fort Myers News–Press; the Naples Daily News; the Sarasota Herald Tribune; and the Observer, a local tabloid. Defendant has purchased television spots on three network affiliates out of Fort Myers and Naples. Before mid–1976, defendant also advertised on two local radio stations. Defendant has placed ads in the yellow pages for Naples, Fort Myers, and Punta Gorda–Port Charlotte. Defendant's president, Hoovis, stated at trial that the ads generally identify defendant as "Shutterworld-the roll shutter leader."

16. Both Schoonover and Hoovis testified at trial that defendant had no knowledge of plaintiff's business or his use of the name "Shutterworld" prior to defendant's first use of the name. There was no evidence presented at trial to refute this. According to Hoovis, defendant first learned of Dieter's trademark in October of 1984, by letter from the U.S. Patent and Trademark office. This was subsequent to defendant's state registration of its "Shutterworld" mark. Hoovis testified that on

the basis of this letter, he and Schoonover concluded that there was no likelihood of conflict between defendant's mark and plaintiff's. They decided this based upon the report that plaintiff's business was located in a separate geographic market (Largo), and involved "interstate" sales as opposed to the purely intrastate business of defendants.

After learning of plaintiff's use of the "Shutterworld" trademark in late 1984, defendant conducted a nationwide search for other users of the name. This search yielded nothing. However, a short time before trial in this case, defendant heard from one of its competitors in Fort Lauderdale that a business out of New York had been using the name. Defendant investigated this information and found that a "Shutter World" appeared in the white pages of the telephone book containing listings for Long Island. Defendant found that the number belonged to a company in the roll shutter business that had been in existence for approximately two years.

17. Defendant's gross product sales for fiscal years 1983 through 1987 (ending 3/31/87) were as follows:

| | |
|---|---|
| 1983 | $ 340,104 |
| 1984 | $ 574,773 |
| 1985 | $ 800,679 |
| 1986 | $1,118,035 |
| 1987 | $1,886,956 |

Hoovis estimated that as of January, 1988 defendant had spent a total of $650,-000 on advertising.

18. The products of both plaintiff and defendant are generally referred to as "shutters," and are listed in the telephone book under the "shutters" classification. *See, e.g.,* plaintiff's exhibit 10. However, plaintiff's wooden interior shutters are physically dissimilar to defendant's metal exterior shutters. *Compare* defendant's exhibits 1, 2 *with* defendant's exhibit 10. The Court is convinced, based upon the testimony and upon the physical evidence,

**2.** Plaintiff's counsel pointed out during examination of Schoonover that on some of defendant's brochures, references were made in text to the name "Shutterworld" without use of the stylized script or slogan. *See, e.g.,* plaintiff's exhibit 12. Schoonover explained that constant

repetition of the slogan in text would have made for "poor copy." The Court notes that on this exhibit, defendant used the word "Shutterworld" to refer to the business and to the product, interchangeably.

that buyers of each of the two types of shutters have different uses for the shutters in mind.

The metal exterior shutters, specifically the "Bahama" and "colonial" shutters that plaintiff carries, also differ in appearance from defendant's roll-down shutters. *See* defendant's exhibit 22. Schoonover stated on behalf of defendant that, in his opinion, the types of exterior shutters carried by plaintiff are primarily ornamental and do not provide much in the way of storm protection.

19. Plaintiff testified that he has recently added "roll-up" shutters to his product line. These shutters are similar to the "roll-down" shutters sold by defendant. The defense witness who had visited plaintiff's Largo showroom testified that he saw one roll-down shutter on display there. He also testified that he was told by an employee named Tom that the roll-down shutter was kept for "legal reasons" that the employee was not to discuss. Plaintiff denied that he ever told an employee that the roll-down shutter was on display for legal reasons, and stated that he was moving into the roll-down shutter business for economic reasons.

Based upon the evidence of defendant's gross sales and recent growth, the Court finds it very likely that plaintiff regards the roll-down shutter business as attractive for economic reasons. However, the evidence showed that plaintiff carries few, if any of the shutters in its stores, and there was no evidence that it sells any through its dealers. This leads the Court to conclude that plaintiff's dealings with this product are as yet insubstantial.

20. According to testimony elicited from plaintiff, a pair of wooden interior shutters, unfinished, costs between $100.00 and $200.00, depending upon the size. Plaintiff testified that a painted or finished pair will cost approximately 40% more. An average sale of defendant's shutters runs from $3,000 to $5,000. Both plaintiff's and defendant's products represent substantial household investments that consumers are unlikely to purchase on impulse.

21. Plaintiff first learned of defendant's use of the name "Shutterworld" in early 1987, during a conversation with James DePaolo of Aeicor Aluminum in Fort Lauderdale. Plaintiff contacted DePaolo because he was interested in purchasing aluminum exterior shutters from Aeicor. James DePaolo, of Aeicor, asked plaintiff whether Dieter's business was affiliated with that of B & H in Fort Myers. DePaolo had learned of defendant's "Shutterworld" operation in late 1985 or early 1986, and had made a sales call on defendant in Fort Myers.

Dieter testified concerning other occasions on which his business was confused with that of defendant. He stated that a short time before trial, he was contacted by an individual, a Mr. Siviur, who wanted to sell plaintiff a display booth at a nearby home show. Siviur was under the impression that plaintiff's "Shutterworld" operation was an outlet of defendant's roll-down shutter business. He told Dieter that he had been informed that "Shutterworld" of Fort Myers was planning to move into Pinellas county during the current year. On another recent occasion, Dieter testified, a caller from New Port Richey had inquired if plaintiff's business was associated with defendant's Fort Myers operation. This caller, Rodney Nichols, was soliciting tenants for a mall in Pinellas County.[3]

One of plaintiff's dealers, David Snyder, testified that back in " '78 or '79" he had received an inquiry from a client who was confused about whether her "Shutterworld" shutters were going to be roll-down shutters. That statement was challenged on cross-examination, on the basis that defendant had not used the name "Shutterworld" before 1983. Snyder conceded that he was unsure of the date of the occurrence. Because of the vagueness of Snyder's recollection, the Court does not credit the story.

---

**3.** Dieter stated that his business was not harmed by either of these inquiries. In fact, he stated that as of the time of trial in this case, he was considering taking advantage of the opportunity to display his products at the home show mentioned by Siviur.

Defendant's witnesses testified that they knew of no case in which a customer had mistaken defendant's business for plaintiff's.

22. After plaintiff learned of defendant's business, in August of 1986, he met with Schoonover and Hoovis in Largo. According to Hoovis, the two representatives of defendant proposed to Dieter that plaintiff carry defendant's roll-down shutter product in its Tampa area stores. Hoovis related that Dieter refused, replying that plaintiff and defendant were in two different businesses. He stated that Dieter then proposed that the plaintiff license defendant's use of the "Shutterworld" name, an offer which Hoovis and Schoonover refused.

23. Plaintiff stated in a declaration, submitted to the U.S. Patent and Trademark office in 1983, that he has made continuous use of his trademark in interstate commerce since 1977. *See* defendant's exhibit 20 (plaintiff's combined sections 8 and 15 declaration). Plaintiff presented evidence at trial to show that he has repeatedly sold goods out of the state of Florida. Dieter testified that in 1981 and 1983 he made sales to customers in Missouri; in 1987 to a customer in New York; and in January of 1988 to a customer in Texas.[4] Witness Snyder, who deals in plaintiff's shutters, testified that he has sold plaintiff's product to out-of-state customers, most recently in Detroit Lakes, Minnesota. Snyder said that he was certain that the shutters shipped to Minnesota had been branded with plaintiff's registered trademark.

*Conclusions of law*

A. Trademark infringement under the Lanham Act, 15 U.S.C. § 1114

Count one of plaintiff's complaint alleges unlawful infringement of a registered trademark under section 32 of the federal Lanham Act, 15 U.S.C. § 1114. Plaintiff claims that defendant's stylized form of the word "Shutterworld" is a "colorable imitation" of its registered mark, and that defendant's use of the word is likely to cause confusion, to cause mistake, or to deceive.

The central question in a trademark infringement case involves the "likelihood of confusion" on the part of consumers between the marks used by the parties. *Freedom Savings & Loan Ass'n v. Way*, 757 F.2d 1176, 1179 (11th Cir.), *cert. denied*, 474 U.S. 845, 106 S.Ct. 134, 88 L.Ed. 2d 110 (1985). In an earlier opinion rendered in this case, the Court (Castagna, J.) denied plaintiff's motion for summary judgment; in so doing, the Court stated that "the factual issue of whether there is a likelihood of confusion ... remains in dispute." (Opinion, December 29, 1987). At trial, the parties therefore devoted most of their proof and arguments to this issue.

A threshold question, however, concerns the extent to which plaintiff's mark deserves trademark protection. Defendant has argued that plaintiff does not enjoy trademark protection over uses of the mark outside of the registered form, or over use of the word "Shutterworld" as a trade name. The proofs in this case show many instances in which plaintiff has made use of his mark outside of the stylized form. They show that plaintiff often has used the mark to modify its business rather than a particular product. The Court therefore finds that the validity of plaintiff's trademark rights in the name "Shutterworld" is a matter deserving of some preliminary discussion.

1. Scope of trademark protection

Section 1115(a) of title 15, United States Code, provides that registration of a mark under the provisions of federal law is prima facie evidence of a registrant's "exclusive right to use the registered mark in commerce on the goods or services specified in the registration." Under 15 U.S.C. § 1115(b), a trademark that has become

---

4. Plaintiff could not at first remember the out-of-state destinations of his shutters, although he stated that he was certain that out-of-state sales had occurred. After plaintiff consulted phone logs at his office, he testified that his memory was refreshed, and he was able to supply the specific information. Plaintiff stated that he was unable to provide documentation for sales made in the seventies, because he had destroyed old records on the advice of his accountant.

"incontestable" under the Lanham Act's provisions is conclusively presumed to be entitled to protection, subject only to specific defenses enumerated in the statute. Incontestability shields a registered mark from the defense that the mark is "merely descriptive" of the goods or services to which it is applied. *Park 'n Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 205, 105 S.Ct. 658, 667, 83 L.Ed.2d 582 (1985).

In this case, plaintiff proved that his mark was granted registration in 1977 for use on "pre-hung wooden shutter assemblies." He also has shown that the registered mark became incontestable upon the filing of the necessary affidavit. *See* 15 U.S.C. § 1065. Plaintiff asserts that these facts conclusively establish his exclusive rights to use of the name "Shutterworld."

■ Defendant, on the other hand, has argued that plaintiff has no rights in the term when it is used with reference to plaintiff's business, rather than the product (i.e., as a trade name); when used on products other than pre-hung wooden shutter assemblies; or when used in plain, block letter form. If plaintiff merely were claiming the protection of registration without the benefit of incontestability, defendant would be partially correct. The presumption of validity that applies to registered marks that have not become incontestable is limited to the specific goods or services listed in the registration. *See, e.g., Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir.1985); *Natural Footwear Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1396 (3d Cir.1985); *see also Chicago Reader, Inc. v. Metro College Publishing Co.*, 711 F.2d 801, 803 (7th Cir. 1983). Plaintiff in such a case still would have the opportunity, however, to demonstrate common-law rights to use of the trademark on unregistered goods or in unregistered form. *See Natural Footwear*, 760 F.2d at 1397 n. 31.

■ However, the mark involved in this case has become incontestable. It is not necessary for plaintiff to prove common

law rights in the mark, or to rebut charges that the mark is merely descriptive. The validity of the mark is not in dispute, and plaintiff may prevent the use of any mark that has been used in such a way as to create a likelihood of confusion with its use of the mark as registered. *See Park 'n Fly*, 469 U.S. at 205, 105 S.Ct. at 667; *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 924–25 (10th Cir.1986); *Source Servs. Corp. v. Chicagoland Jobsource, Inc.*, 643 F.Supp. 1523, 1527 (N.D.Ill.1986).

■ Defendant has claimed that plaintiff has abandoned use of the mark in its registered form. Abandonment is one of the several defenses to an incontestable mark enumerated in 15 U.S.C. § 1115(b). It is an affirmative defense, requiring strict proof of two distinct elements. *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1516 (11th Cir. 1984). Defendant must show that plaintiff actually discontinued use of the mark, and that plaintiff intended to abandon the mark. *Id.; Citibank, N.A. v. Citibanc Group, Inc.*, 724 F.2d 1540, 1545 (11th Cir. 1984).

■ Defendant's claim of abandonment emphasizes two separate circumstances. First, defendant claims that the testimony of its witnesses showed that the shutters for sale in plaintiff's stores were not branded with plaintiff's trademark. It claims that this shows nonuse of the mark. Second, defendant claims that the evidence, particularly earlier statements by plaintiff Dieter made during the course of discovery, show that plaintiff does not sell trademarked goods in interstate commerce.[5]

Under 15 U.S.C. § 1127, proof of a registrant's nonuse of a mark for two consecutive years constitutes prima facie evidence of abandonment. The registrant can dispel the effect of the evidence, however, by proving that the circumstances do not justify the inference of intent not to resume use of the mark. *E. Remy Martin & Co. v.*

---

5. The argument concerning out-of-state sales of plaintiff's shutters is also the basis for defendant's request that the Court cancel the registra-

tion of Dieter's mark. That request is discussed *infra*.

*Shaw–Ross Int'l Imports, Inc.,* 756 F.2d 1525, 1532 (11th Cir.1985).

Defendant has not made even a prima facie showing of abandonment. The evidence is hazy regarding the extent to which plaintiff has continued to use his mark. However, plaintiff did prove that he has offered trademarked goods for sale within the past two years. Defendant's witness Abrahamson testified that during his visit to plaintiff's Largo showroom in November of 1987, he saw "some" marked shutters. Plaintiff testified that most of the shutters he sells are marked, and that he has continued to use the mark up to the present time. There was competent evidence of recent out-of-state sales of plaintiff's shutters. Witness Snyder, testifying for plaintiff, stated that a "recent" shipment of trade-marked painted shutters had been made to an out-of-state customer.[6] The Court finds that on the basis of these facts, it cannot conclude either that plaintiff actually has abandoned or has intended to abandon its registered trademark.

### 2. Likelihood of confusion

There are seven factors to be considered in determining whether two marks create a likelihood of confusion. They are: the type of trademark at issue; similarity of design; similarity of products; identity of purchasers and similarity of retail outlets; similarity of advertising campaigns; defendant's intent; and actual confusion. *Freedom Savings,* 757 F.2d at 1182; *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 972 (11th Cir.1983).

One of the most critical factors in the analysis concerns the type of mark at issue. As a general rule, the more distinc-tive a trademark is, the greater the likelihood that consumers will identify it with a particular product. Distinctive marks are therefore accorded the highest degree of protection.[7] *Freedom Savings,* 757 F.2d at 1182.

There are generally considered to be four categories of trademark strength. A trademark will be classified as either arbitrary, suggestive, descriptive or generic. *Id.,* 757 F.2d at 1182 n. 5; *American Television & Communications Corp. v. American Communications & Television,* 810 F.2d 1546, 1548 (11th Cir.1987). Marks are accorded protection according to the category into which they fall, with "arbitrary" marks receiving the most protection and "generic" marks the least. *American Television,* 810 F.2d at 1548. A descriptive mark or name is one that naturally indicates the qualities, character, effect or purpose of a product. *Vision Center v. Opticks, Inc.,* 596 F.2d 111, 116 (5th Cir. 1979). It often employs terms that competitors are likely to use or have used in describing their goods. *Id.* at 116–17. Generic marks refer to the particular genus of which individual goods are an example; these marks are never entitled to trademark protection. *Freedom Savings,* 757 F.2d at 1182 n. 5.

The unadorned term "shutter" is clearly generic. Similarly, the word "world" is generic when applied to a place where one could expect to find a large number and variety of shutters. "World" is an extremely common suffix for businesses of all types in Florida; defendant's founders testified to that fact when they explained the genesis of their "Shutter-

---

6. The Court cannot accept defendant's argument that once plaintiff's marked shutters have been painted or stained, they are tantamount to unmarked goods. As the Court already found, painting over the "Shutterworld" brand obscures but does not obliterate the trademark. On the painted sample submitted to the Court, the middle letters "erw" are not visible, but the outer letters and the distinctive overall characteristics of the mark are still evident. The circled "R" that follows the mark is highly visible. *See* defendant's exhibit 4.

7. The fact that plaintiff's mark is incontestable does not prevent the Court from assessing its strength in this context. The mark is presumed not to be merely descriptive when it comes to the question of validity. However, this does not establish the mark's status for purposes of determining the likelihood of confusion issue. Validity and likelihood of confusion are separate issues. *See Source Servs. Corp. v. Chicagoland Jobsource, Inc.,* 643 F.Supp. 1523, 1532–33 (N.D. Ill.1986).

world" name.[8] The fact that plaintiff here has combined the generic term "shutter" with the term "world" does not in this case make the name significantly more distinctive. *Cf. Computerland Corp. v. Microland Computer Corp.*, 586 F.Supp. 22, 24 (N.D.Cal.1984) (name "Computerland" found to be descriptive "at best" when applied to retail stores selling computers); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 12 (2d Cir.1976) (name "Safariland" generic when applied to portion of defendant's store given over to sale of "safari" clothes). The word "Shutterworld" is, in the Court's estimation, generic when used as a trade name in describing plaintiff's shutter business.

The Court here is concerned, however, with protection only of plaintiff's use of the name on the products specified in the registration.[9] When applied to the pre-hung wooden shutters themselves, the name "Shutterworld" is not generic. Insofar as the word refers to a place rather than to the product, its use on the product is at first glance incongruous. This incongruity lends a certain distinctiveness to the term when so used. However, the fact that the name prominently contains the product's generic name (shutter) detracts from its distinctiveness. Purveyors of either wooden or roll-down shutters will have an obvious tendency to select the word "shutter" in describing their products. The Court finds the net result to be a term best characterized as descriptive, especially in light of the principle that "[t]he concept of descriptiveness must be construed rather broadly." *Vision Center*, 596 F.2d at 116 (quoting 3 R. Callman, *The Law of Unfair Competition, Trademarks & Monopolies* § 70.2 (3d ed. 1969)).

The owner of a descriptive mark can show that his mark is entitled to heightened protection if the mark has gained "secondary meaning." Secondary meaning refers to the tendency of the consuming public to associate a trademark with a particular producer. *American Television & Communications Corp. v. American Communications & Television, Inc.*, 810 F.2d 1546, 1549 (11th Cir.1987). In deciding whether secondary meaning is present, a court should look at factors bearing upon the extent to which a producer has promoted such a conscious connection in the mind of the consuming public, and the extent to which such a connection has been achieved. *See id.; Conagra, Inc., v. Singleton*, 743 F.2d 1508, 1513 (11th Cir.1984).

The plaintiff in this case has failed to show the existence of secondary meaning for its mark "Shutterworld." There is evidence that plaintiff has intended to promote such meaning; the very mark superficially refers to the source of the product as much as to the product itself. Consumers probably assume that shutters marked "Shutterworld" came from a business bearing that name. There is no evidence, however, that the name "Shutterworld" is associated in the minds of consumers with *plaintiff's* business, especially in light of the fact that the name "Shutterworld," as applied to a business involving the sale of shutters, is not distinctive. Plaintiff's witness Snyder testified that several of his decorating clients, who had received shutters bearing plaintiff's trademark, inquired of Snyder whether he was doing business as "Shutterworld." This in fact shows a *lack* of secondary meaning, in that it shows that those consumers were completely ignorant of who had produced the product.

A second criterion for consideration pertains to similarity in trademark design. There is a strong similarity of design here. The names used by each business are iden-

---

8. Schoonover testified that the decision to use the name was reached while he and Hoovis were in Orlando, home of "Walt Disney World." It was there that they noticed the prevalence of "world" as a business suffix. The witness stated that they had wanted to conform their business name to their environment, and that "Shutterworld" seemed "a logical conclusion."

9. The scope of the conclusive presumption of validity provided by incontestability, under 15 U.S.C. § 1065, extends only that far. *See* 15 U.S.C. § 1065; *see also M-F-G Corp. v. EMRA Corp.*, 817 F.2d 410, 411 (7th Cir.1987); *In re Loew's Theatres, Inc.*, 769 F.2d 764, 769 (Fed.Cir. 1985).

tical; the designs are reminiscent of each other in that each stresses the word itself and the letter "O." *Compare* plaintiff's exhibit 2 (appendix 1) *with* plaintiff's exhibit 11 (appendix 2).

The matter of similarity of products was a focus of attention at trial. Defendant sought to show that its exterior roll-down shutter is a product entirely distinct from the wooden shutter that bears plaintiff's registered mark. The Court finds that the roll-down security shutter differs from the interior decorative shutter in appearance, in purpose, in function, and in price. Although both kinds of shutters are properly referred to as "shutters" and both are intended for installation near windows, they are distinct products.

 The inquiry concerning likelihood of confusion, however, requires the Court to proceed further and to decide whether the two products, although distinct, are of the type that consumers tend to attribute to the same producer. Trademark protection extends beyond goods listed in the registration certificate to embrace such closely-related goods. Use of a similar trademark on closely similar types of goods obviously poses a possibility of confusion. *E. Remy Martin,* 756 F.2d at 1530.

The evidence in this case shows that interior and exterior shutters often are offered for sale by a single producer or dealer. The parties introduced pages from telephone book listings under the classification "Shutters"; some of the ads pictured there had been placed by dealers who carried both interior and exterior shutters. *See* plaintiff's exhibits 10, 13. Aeicor Aluminum, the producer of the exterior aluminum shutters sold by plaintiff, exhibits decorative "Bahama" shutters as well as roll-down security shutters in its brochure. *See* defendant's exhibit 22. There appears to be considerable overlap among various shutter dealers with respect to the product lines carried. Consumers therefore would

have a sound basis for concluding that a seller of wooden interior shutters also would deal in roll-down shutters.

The next element for consideration concerns the identity of purchasers and similarity of retail outlets. The testimony in this case shows that both plaintiff and defendant make sales directly to homeowners. Based upon the evidence concerning the two products, the Court concludes that it is more than likely that many homeowners who have purchased one type of shutter also will have occasion to purchase the other kind. As stated, the shutters serve different purposes; however, those purposes in many ways are complimentary. Snyder testified that the interior wooden shutters he sells often are installed in smaller windows, such as bathroom windows. By contrast, the defendant's shutters depicted in its brochures and ads appear primarily in larger, floor-length windows, such as porch windows. Further, some of the photographs show two sets of shutters in a single window: one set inside, and one outside. A homeowner conceivably would find it advantageous to outfit his home with both kinds of shutters.[10]

The retail strategies of plaintiff and defendant are not similar, however. Plaintiff makes sales through dealers, and directly to customers from its two retail outlets. Defendant, on the other hand, makes most of its sales at customers' homes. It does not maintain a separate showroom for its products. This difference decreases the likelihood of confusion.

The Court is also concerned with similarities between the two parties' advertising campaigns. The evidence shows that both plaintiff and defendant have made extensive use of telephone book and newspaper advertising. However, the ads are aimed at consumers in different geographic areas. The evidence shows no medium in which both plaintiff and defendant have advertised simultaneously.[11] The Court finds it

10. Schoonover testified that defendant in fact has received referrals from Interiors by Tilley of Naples, which is one of the decorators that deals in plaintiff's shutters.

11. Although both plaintiff and defendant have at various times bought ads in the Sarasota Herald Tribune, plaintiff stopped advertising in the Sarasota area years before defendant began its business.

significant, in this respect, that the items sold by both plaintiff and defendant are high-priced, permanent household items that a customer would be likely to purchase only after some degree of deliberation. For this reason, it seems probable that most consumers would purchase shutters in or near the area in which they live. Therefore, the geographic separation of the parties' businesses is in this case a significant factor, and one that militates against possible confusion.

A sixth factor in the analysis concerns the defendant's intent. The Court here is concerned with whether defendant appropriated plaintiff's mark with the aim of inducing customer confusion. A finding of such malicious purpose will make a court more likely to find a likelihood of confusion. *Freedom Savings*, 757 F.2d at 1185.

In this case, the evidence shows no nefarious purpose by defendant. In fact, it shows that defendant's officers went to some lengths to assure themselves that they were entitled to use the "Shutterworld" name. They received assurance that no such name previously had been registered in Florida. They conducted a nationwide search for other users of the name. They continued to use the "Shutterworld" mark only after they determined, in good faith, that plaintiff's use of the mark applied to a distinct product in a separate geographic market. No evidence showed that defendant was aware of any goodwill attaching to the name by virtue of plaintiff's use of it; much less did it show that there was any intent on defendant's part to appropriate that goodwill to its business.

The final element is actual confusion. Actual confusion by even a few customers is considered the best evidence of a likelihood of confusion by many customers. *Id.* The Court finds that in this case, there

is no solid, credible evidence that any potential customer has mistaken defendant's business for plaintiff's.

Plaintiff Dieter related incidents in which individuals had inquired whether his business was related to that of defendant. Each of these incidents, however, involved persons who were not customers or potential customers. There was no confusion on the part of any person who had more than a superficial acquaintance with either business. *Cf. Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1167 (11th Cir.1982) (confusion of individuals, not customers, who are only casually acquainted with a business is entitled to little weight). The only instance of customer confusion was related by plaintiff's expert Snyder. This testimony, however, was not credible because of the witness's initial conviction that the event had occurred *before* defendant began to use the trademark. The Court notes in any event that all of the incidents related involved situations in which plaintiff's business was taken to be defendant's, rather than vice versa. There was no situation related in which defendant's use of the mark had triggered an association with plaintiff's business in the mind of a consumer. The Court also notes that defendant had been doing business in the Fort Myers area for between three and four years before any instance of confusion was reported. In light of all of this, the Court finds plaintiff's "actual confusion" evidence to be minimal at best. *Cf. Sun Banks of Florida, Inc. v. Sun Federal Savings & Loan Ass'n*, 651 F.2d 311, 319 (5th Cir.1981).

Analysis of all of these elements leads the Court to conclude that there is no likelihood of confusion. There is therefore no justification for enjoining defendant's use of the "Shutterworld" name or granting plaintiff the other relief it seeks.[12]

---

**12.** Even if a likelihood of confusion existed here, the circumstances of this case would defeat plaintiff's request for monetary relief. The Lanham Act, 15 U.S.C. § 1117, authorizes courts to award profits and damages in cases of proven infringement. Such awards, however, are "subject to the principles of equity" and are to constitute compensation, not a penalty. *Id.; see*

*Burger King Corp. v. Mason*, 710 F.2d 1480, 1495 (11th Cir.1983). A plaintiff seeking such an award must show with specificity the damages he has sustained. Plaintiff is entitled to recover the profits defendant has obtained through sales made to purchasers who were seeking plaintiff's product, but were misled by the unlawful in-

Chief among the factors that the Court finds significant are the weakness of the plaintiff's mark, and the lack of proof of actual confusion on the part of consumers. *Cf. Freedom Savings,* 757 F.2d at 1186 (type of mark and actual confusion are considered the most important factors in the analysis). The Court notes that, although the names used by the parties are the same, the goods involved are high-priced, permanent items that customers will investigate before purchasing. The two sets of goods are not in direct competition with each other, as they serve distinct purposes. It also notes that plaintiff testified that most of his customers outside of the Tampa area are builders or interior decorators, who can be expected to be relatively sophisticated buyers.

### B. Unfair competition under the Lanham Act

■ Plaintiff has claimed that defendant's use of the name "Shutterworld" constitutes unfair competition under 15 U.S.C. § 1125(a). This count is not automatically barred by failure of plaintiff's infringement action, as unfair competition is broader in scope than infringement. *Freedom Savings,* 757 F.2d at 1186. The law of unfair competition will, for example, protect a holder of rights in an unregistered trademark or trade name. *Id.*

■ Plaintiff's attempt to vindicate rights in its registered "Shutterworld" mark has been explored fully *supra.* Plaintiff conceivably could claim that it has common law rights in its use of the word "Shutterworld" as a trade name (describing his business, rather than the product), and on goods other than those mentioned in his registration. *See Natural Footwear Ltd. v. Hart, Schaffner & Marx,* 760 F.2d 1383, 1397 n. 13 (3d Cir.1985). However, the fact that the name is merely descriptive, without secondary meaning, prevents his having protectable rights in those uses of the mark. *See American Television & Communications Corp. v. American Communications & Television, Inc.,* 810 F.2d 1546, 1548 (11th Cir.1987). Therefore, plaintiff has no valid claim for unfair competition.

### C. Trademark infringement and dilution under Florida law

The finding that defendant has not infringed plaintiff's trademark under federal law also disposes of the state law infringement claim. *See Sun Banks,* 651 F.2d at 319.

■ Plaintiff's dilution claim is based upon Fla.Stat.Ann. § 495.151. Under this statute, the holder of a trademark can prevent other users of his mark from "diluting" its commercial value by applying it to distinct goods or services. A dilution claim, however, requires some proof that there has been an actual decrease in the commercial value of the plaintiff's mark. *Freedom Savings,* 757 F.2d at 1186. In this case, plaintiff presented no evidence to that effect. He therefore has not satisfied the burden on his dilution claim.

### D. Cancellation of plaintiff's mark

Defendant formally moved at trial for cancellation of plaintiff's federal registration of the "Shutterworld" mark, pursuant to 15 U.S.C. § 1064. Defendant asserts that plaintiff has not been able to document its claim that it has made interstate sales of trademarked goods. The defendant also attempted throughout trial to prove that plaintiff has abandoned its use of the mark.

Under section 1064, registration of a trademark is subject to cancellation more than five years after the date of registration only under specific circumstances. Those circumstances include abandonment of the mark, or fraud in the initial registration. In this case, defendant has argued that plaintiff has abandoned its use of the

---

fringement. *St. Charles Mfg. Co. v. Mercer,* 737 F.2d 891, 892–93 (11th Cir.1983).

In this case, the only instances of actual confusion that plaintiff was able to prove were not harmful to plaintiff. In fact, he testified that

because of at least one of the incidents, he obtained an opportunity to participate in a local "home show." There was no evidence that defendant had gained any sale or other advantage because of the similarity of trademarks.

"Shutterworld" mark. As discussed above, however, the proofs in this case do not yield the conclusion that plaintiff has abandoned its use of the mark, as the term "abandoned" is defined in the Act. *See* 15 U.S.C. § 1127.

■ Defendant also asserts that plaintiff's registration is void because plaintiff cannot prove that it shipped trademarked goods in interstate commerce prior to the date of the registration. Because plaintiff's registration has become incontestable this argument only will support cancellation if defendant is able to prove that plaintiff's registration was obtained fraudulently. *See* 15 U.S.C. §§ 1064, 1065. Cancellation on the grounds of fraud is something that courts should not undertake lightly; a defendant attempting to prove fraud must show by clear and convincing evidence that plaintiff deliberately attempted to mislead the federal Patent Office. *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 942 (10th Cir.1983).

There is no evidence of fraud in this case. Defendant pointed out that in interrogatories and during Dieter's deposition, plaintiff identified only individuals in Florida as specific customers. At the time of trial, however, plaintiff testified to specific interstate sales made during the past few years; he also testified that his sales records for the seventies had been destroyed on the advice of his accountant. There was no evidence that at any point plaintiff knowingly had misrepresented the interstate nature of his business. Therefore, defendant has presented no adequate grounds for cancellation of plaintiff's incontestable mark.

### E. Attorney's fees

■ Defendant has requested an award of attorney's fees in this case. Under 15 U.S.C. § 1117, the Court has the power in "exceptional cases" to award fees to the prevailing party. An award of fees only is proper, however, where there is evidence of fraud or bad faith. *Safeway Stores, Inc. v. Safeway Discount Drugs*, 675 F.2d 1160, 1167 (11th Cir.1982). There is no evidence of either on the part of plaintiff in this case; therefore a fee award would be highly inappropriate.

### Conclusion

In light of the foregoing, IT IS HEREBY ORDERED that judgment be entered in favor of the defendant, and that the complaint in this case be DISMISSED.

IT IS SO ORDERED.

APPENDIX 1